Stephanie Kay WOFFORD *v.* STATE of Arkansas

CR 97–38 952 S.W.2d 646

Supreme Court of Arkansas
Opinion delivered October 2, 1997

*Walker, Shock & Harp, PLLC*, by: *J. Randolph Shock*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Stephanie Kay Wofford pleaded *nolo contendere* to first-degree murder in connection with the death

of her five-year-old son Mark. She was convicted pursuant to her plea and sentenced to life imprisonment. In accordance with Ark. R. Crim. P. 24.3(b), Ms. Wofford's plea was conditional; thus she reserved the right to appeal from the Trial Court's denial of her motion to suppress evidence. The evidence in question included statements that were either given while she was not in custody or were preceded by an adequate *Miranda* warning. We hold there was no requirement that the statements be suppressed.

Also in question, however, are items of evidence seized by police officers who entered Ms. Wofford's home without a warrant sometime after other officers had entered without a warrant but pursuant to circumstances the Trial Court deemed exigent. The question to be answered is whether the officers entering later could properly seize items that could have been seized by the first entering officers because they were inadvertently seen by them in "plain view" while they were there for emergency purposes. As there was no testimony on the point at the suppression hearing, we cannot determine whether the items seized were in plain view of the officers who first entered. We, therefore, must remand the case for the limited purpose of determining the answer to that question. If it is properly determined by the Trial Court that the items seized were seen in plain view by the officers who initially entered Ms. Wofford's home, the conviction will be affirmed.

Before considering Ms. Wofford's suppression arguments, we note that she has raised two points of appeal not permitted by Rule 24.3(b) and the conditional plea arrangement. Those arguments concern the Trial Court's upward departure from the sentencing guideline contained in Ark. Code Ann. §§ 16-90-803 and 16-90-804 (Supp. 1995) and an alleged violation of Ark. Sup. Ct. Admin. Order #6 having to do with cameras in the courtroom. As a general rule, one is not allowed to appeal from a conviction resulting from a plea of guilty or *nolo contendere*. Ark. R. App. P.—Crim. 1(a). *See Payne v. State,* 327 Ark. 25, 937 S.W.2d 160 (1997). Rule 24.3(b) presents an exception to the rule but only for the purpose of determining on appeal whether an appellant should be allowed to withdraw her plea if it is concluded that evidence should have been, but was not, suppressed.

We, therefore, decline to consider the two points that do not concern suppression of evidence.

## 1. The search

From the home where she and her son lived, Ms. Wofford telephoned her parents' home, which was apparently nearby in Ft. Smith. Ms. Wofford's sister, Amanda Hutchins, learned of the call and believed "something was wrong." Ms. Hutchins went to Ms. Wofford's home where she found Ms. Wofford sitting on a couch with blood on her wrists and clothing. Ms. Wofford's father and brother, along with family friend Henry McMurtery, then arrived. Ms. Hutchins called 911 and reported that Ms. Wofford had tried to kill herself, that there was blood "all over," and that Ms. Wofford had said her son would not wake up.

Ft. Smith police officers William Ohm and David C. Boyd, Jr., were on patrol on Ms. Wofford's block. They heard a dispatch and arrived at Ms. Wofford's house almost immediately. They understood that a child was "down and bleeding," and they thought it might have been as the result of a traffic accident. Ms. Wofford's father, sister, and brother were in the yard along with Mr. McMurtery who waived to the police officers to follow him into the house, saying, "They're in here." Mr. McMurtery had not only seen Ms. Wofford as previously described but had been to the rear of the house and had found Mark on a bed in Ms. Wofford's bedroom with his wrists cut and his eyes open and dilated.

The officers entered the house without a warrant shortly after 3 p.m. and spent ten or fifteen seconds checking Ms. Wofford's vital signs. Officer Boyd, Jr., remained with Ms. Wofford while Officer Ohm followed Mr. McMurtery to the bedroom to examine Mark. By 3:29 p.m., Officer Ohm had determined that Mark was deceased. He returned to the living room and told Officer Boyd, Jr., to secure the area. In the meantime, Officer Boyd, Jr., had attempted to learn what had happened from Ms. Wofford. She appeared to be dazed and said only, "I can't die. I cannot die," and she asked, "Why won't he wake up?" When asked about her cut wrists she replied that she had cut them with a knife that was in "the back room."

At around 3:40 p.m., Officer Ohm called for a supervising officer, an additional police unit, and an emergency medical services ("EMS") unit for Ms. Wofford. The EMS unit arrived around 3:50 p.m. As Officers Ohm and Boyd, Jr., were securing the perimeter of the home, they noticed a door leading from the outside into Ms. Wofford's bedroom. The door appeared to have been kicked in or struck with a sharp object. There were drops of blood and shattered glass. After securing the area, Officer Boyd, Jr., began keeping a detailed log of entries and exits.

At 4:00 p.m. Ms. Wofford left for a hospital emergency room in an ambulance. Officer Chris Boyd, Sr., had arrived at the scene at 4:05 p.m. At 4:41 p.m. Officer Boyd, Sr., left for the hospital where he was later to question Ms. Wofford. On her way to the hospital Ms. Wofford told an emergency medical technician, "He wouldn't breathe, so, I cut his wrists to match mine."

At 4:05 and 4:15 p.m., respectively, Officer Risley and Sergeant Lonetree arrived. Officer Risley entered the home at 4:05 p.m. with other officers but withdrew because of a strong odor of gas or petroleum. Sergeant Lonetree had brought a video camera and equipment to be used to gather evidence. He was, however, initially unable to enter the house on account of safety concerns relating to the gas or oil fumes. After the crime scene had been secured, firemen arrived at 4:32 p.m. and left at 5:20 p.m. Personnel from the gas company arrived at 5:07 p.m., turned off the gas, and left at 5:35 p.m. The coroner left with Mark Wofford's body at 5:38 p.m.

After receiving assurance that it was safe to enter the premises, Sergeant Lonetree and Officer Risley did so without a warrant. As they walked through the rooms of the house, they took photographs and made a videotape. At 6:10 p.m., they seized the first piece of evidence. By 8:55 p.m., they had seized 29 additional items. Sergeant Lonetree testified that the items seized were in plain view.

In denying Ms. Wofford's motion to suppress the evidence seized from her home, the Trial Court found that the officers' initial, warrantless entry was justified by "exigent circumstances." The Trial Court also found the officers had obtained "some form

of consent" to enter the home. The Trial Court further indicated that the seizure of evidence was permissible as it was in plain view. Ms. Wofford contends that none of the established exceptions to the Fourth Amendment's warrant requirement justified the entry into, and search of, her home.

### a. *Officers Ohm and Boyd, Jr.*

Ms. Wofford correctly states in her brief that, as Officers Ohm and Boyd, Jr., entered her residence without a warrant, their entry must be viewed as illegal unless the State established the availability of an exception to the warrant requirement. *Williams v. State,* 327 Ark. 213, 939 S.W.2d 264 (1997); *Willett v. State,* 298 Ark. 588, 769 S.W.2d 744 (1989). Ms. Wofford maintains the State failed to satisfy its burden and that the Trial court erred by finding that the officers had consent to enter her home and that their entry was justified by exigent circumstances. In her view, therefore, the evidence obtained by the police as a result of the officers' initial entry into her home should be suppressed as the fruits of an entry made in violation of the Fourth Amendment. *See Wong Sun v. United States,* 371 U.S. 471 (1963).

When we review a ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances, viewing the evidence in the light most favorable to the State. We reverse only if the ruling is clearly against the preponderance of the evidence. *Norman v. State,* 326 Ark. 210, 931 S.W.2d 96 (1996).

Applying this standard, we affirm the Trial Court's ruling that the officers' initial entry was justified by exigent circumstances. Given the testimony adduced at the suppression hearing, that ruling was correct under Ark. R. Crim. P. 14.3, which establishes the "emergency exception" to the warrant requirement and provides in part as follows:

> An officer who has reasonable cause to believe that premises or a vehicle contain:
>
> (a) individuals in imminent danger of death or serious bodily harm . . .

\* \* \*

> may, without a search warrant, enter and search such premises and vehicles, and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

The United States Supreme Court has repeatedly recognized the emergency exception in its Fourth Amendment jurisprudence. *See, e.g., Thompson v. Louisiana,* 469 U.S. 17 (1984); *Mincey v. Arizona,* 437 U.S. 385 (1978). In the *Mincey* case, the Court said that it does

> not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. *Michigan v. Tyler,* [436 U.S. 499, 509-10 (1978)]. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S. App. D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan v. Tyler, supra,* at 509-510; *Coolidge v. New Hampshire,* [403 U.S. 443, 465-66 (1971)].
>
> But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," *Terry v. Ohio,* [392 U.S. 1, 25-26 (1968)] . . . .

*Mincey v. Arizona,* 437 U.S. at 392-93 (footnotes omitted). *See generally* 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6(a), at pp. 390-403 (3d ed. 1996).

■ It is true that Officer Ohm entered Ms. Wofford's bedroom in search of Mark Wofford despite Mr. McMurtery's statement that he believed the child was already dead. This aspect of the search was nonetheless consistent with Rule 14.3(a) because Mr. McMurtery's assessment of the child's condition could well

have been incorrect. "Frequently, the report of a death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid." *Patrick v. State,* 227 A.2d 486, 489 (Del. 1967). In short, the officer's entry into the bedroom was clearly related to the objectives of the authorized intrusion into the residence. *See generally* LaFave, *supra,* at p. 393-94 and n.19-23.

As the Supreme Court of Wisconsin has noted, the Fourth Amendment's "reasonableness" requirement is satisfied in the case of an emergency entry into a home "by the compelling need to render immediate assistance to the victim of a crime, or insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection." *State v. Kraimer,* 298 N.W.2d 568, 572 (Wis. 1980). "[T]he purpose of assisting the victim if still alive supplie[s] a compelling reason for immediate entry, quite apart from the purpose of prosecuting for crime." *State v. Hoyt,* 128 N.W.2d 645, 651 (Wis. 1964).

■ Thus, under the emergency exception, a warrantless entry into a home may be upheld if the State shows that the intruding officer had "reasonable cause" to believe that someone inside the home was "in imminent danger of death or serious bodily harm." Ark. R. Crim. P. 14.3(a). Any search that follows the emergency entry may be upheld under this rule only if the search was "reasonably necessary for the prevention of such death, bodily harm, or destruction," *id.,* and is "strictly circumscribed by the exigencies" that necessitated the emergency entry in the first place. *Mincey v. Arizona,* 437 U.S. at 393, *quoting Terry v. Ohio,* 392 U.S. at 25-26. *See People v. Mitchell,* 357 N.E.2d 607, 610 (N.Y. 1976)("There must be a direct relationship between the area to be searched and the emergency."). However, as the Supreme Court noted in the *Mincey* case, the police may seize evidence that they observe in plain view while conducting "legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. at 393. We applied the exception in *Combs v. State,* 270 Ark. 496, 606 S.W.2d 61 (1980).

■ The record does not indicate that the entry of Officers Ohm and Boyd, Jr., exceeded the scope of the emergency that justified it. Moreover, it is clear that they did not seize any evi-

dence in the home, although they could have done so had they observed the evidence in plain view "during the course of their legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. at 392-93.

■ We note Ms. Wofford's suggestion that Rule 14.3(a) cannot apply to the case at bar because Officer Ohm and Boyd, Jr., at the time of entering her home, lacked probable cause to believe that a crime had been, or was being, committed. In support of her suggestion, she cites *Mitchell v. State,* 294 Ark. 264, 742 S.W.2d 895 (1988). In the *Mitchell* case, we held the officer's warrantless entry into the appellant's home was illegal because the officer lacked probable cause to believe a crime had been, or was being, committed and because there were no exigent circumstances. Thus, the entry was not covered by the exception to the warrant requirement discussed in *Payton v. New York,* 445 U.S. 573 (1980). We also said that the officer's entry was not justified by the need to render emergency aid. We did not suggest, however, that the exigent-circumstances exception contained in Rule 14.3(a) requires an officer to have probable cause to believe a crime has been, or is being, committed on the premises. Probable cause is, of course, the basis upon which a warrant to search may be granted. *See* Ark. R. Crim. P. 13.1(d); *Century Theaters, Inc., v. State,* 274 Ark. 484, 625 S.W.2d 511 (1981).

Finally, in light of our agreement with the conclusion that Officers Ohm and Boyd, Jr., were justified by exigent circumstances in entering Ms. Wofford's home, we do not resolve the question of whether the officers had consent to enter the residence. The officers conceded at the hearing that they lacked consent to enter the residence.

### b. Sergeant Lonetree and Officer Risley

Our holding that Officers Ohm and Boyd, Jr., legally entered Ms. Wofford's home does not, by itself, answer the question whether the subsequent warrantless intrusion made by Sergeant Lonetree and Officer Risley comports with the Fourth Amendment's requirement that searches and seizures be reasonable. As with any warrantless search and seizure, the one with which we

are concerned here must be viewed as illegal unless the State has established the availability of a warrant-requirement exception. *Williams v. State, supra; Willett v. State, supra.*

As mentioned, the Trial Court ruled that the evidence seized by Sergeant Lonetree and Officer Risley was admissible because it was in plain view when the officers observed it. Ms. Wofford maintains that the Trial Court erred in relying on the plain-view exception to the warrant requirement because (1) Sergeant Lonetree and Officer Risley were not lawfully present in the house when they observed the evidence; and (2) their discovery of the evidence was not inadvertent. Viewing the evidence favorably to the State, we cannot say that the Trial Court's ruling on the admissibility of the evidence seized by Sergeant Lonetree and Officer Risley is clearly against the preponderance of the evidence, *Norman v. State, supra,* assuming the items seized had been observed in plain view by Officers Ohm and Boyd, Jr.

■ Ms. Wofford first contends that the plain-view exception does not apply here because Sergeant Lonetree and Officer Risley were not lawfully present in her home when they observed in plain view the thirty items of evidence that they ultimately seized. According to the decisions of this Court and the Supreme Court of the United States, one of the prerequisites for applying the plain-view exception is that "the initial intrusion that brings the police within plain view of such [evidence] is supported," if not by a warrant, then "by one of the recognized exceptions to the warrant requirement." *Arizona v. Hicks,* 480 U.S. 321, 326 (1987) (citations omitted). *See Williams v. State,* 327 Ark. at 218, 939 S.W.2d at 267 (stating an element of the plain-view exception is that "the initial intrusion was lawful"); *Johnson v. State,* 291 Ark. 260, 263, 724 S.W.2d 160, 162, *cert. denied,* 484 U.S. 830 (1987).

Thus, in order to uphold the officers' search and seizure of evidence in Ms. Wofford's home pursuant to the plain-view exception, we must find that the officers' initial warrantless intrusion into the residence was lawful. Ms. Wofford contends that their initial intrusion was not lawful because it was covered by none of the exceptions to the warrant requirement. Because the evidence was obtained as the result of an illegal entry, argues Ms.

Wofford, the evidence should be suppressed as the fruits of an illegal entry and search. *See Wong Sun v. United States, supra.*

At first glance, Ms. Wofford's argument appears convincing. There is no question that Sergeant Lonetree and Officer Risley lacked consent to enter and conduct a search of the premises. It also is clear that exigent circumstances were no longer extant when Sergeant Lonetree and Officer Risley entered the home and commenced their search.

The emergency that validated the entry of Officers Ohm and Boyd, Jr., at 3:26 p.m. had ceased shortly thereafter when those officers ascertained the condition of Ms. Wofford and her son and secured the crime scene. By 4:00 p.m., the police had concluded that Mark Wofford was dead, the coroner had arrived, and Ms. Wofford had been taken to the emergency room. The exigent circumstances that justified the first two officers' entry at 3:26 p.m. simply did not exist when Sergeant Lonetree and Officer Risley entered Ms. Wofford's residence. Thus, those circumstances alone could not have validated the subsequent entry made by Sergeant Lonetree and Officer Risley. *See La Fournier v. State,* 280 N.W.2d 746, 749 (Wis. 1979)(stating the emergency exception "may not be relied upon where the entry is secured *after* the emergency is terminated")(emphasis added).

Moreover, as the crime scene had been secured, there was no emergency concerning "the risk of removal or destruction of evidence," *Humphrey v. State,* 327 Ark. 753, 766, 940 S.W.2d 860, 867 (1997), that might have justified Sergeant Lonetree's and Officer Risley's entry. Nor were the officers permitted to enter the home simply because they may have suspected that a murder had occurred there. The Supreme Court of the United States has consistently held that a warrantless search of a home cannot be validated under the emergency exception "simply because a homicide recently occurred there." *Mincey v. Arizona,* 437 U.S. at 395. The Court in the *Mincey* case declined "to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." *Id.* at 394. *See also Thompson v. Louisiana,* 469 U.S. at 21 (stating that, in the *Mincey* case, the Court

"unanimously rejected the contention that one of the exceptions to the Warrant Clause is a 'murder scene exception'"). We noted the Supreme Court's rejection of the "murder scene exception" in our opinions in *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988), and *Alford v. State*, 291 Ark. 243, 724 S.W.2d 151 (1987).

Even if the police collectively had acquired probable cause to arrest Ms. Wofford, probable cause to arrest Ms. Wofford could not have supplied a basis for entering her home without a warrant, at least in the absence of exigent circumstances and Ms. Wofford's *presence* in the home. *See Payton v. New York, supra.* Finally, any emergency arising from the gas or oil fumes could not have justified the officers' entry given Sergeant Lonetree's testimony that he and Officer Risley entered the residence *after* having been assured that the "crisis" was over.

Thus, we cannot say that Sergeant Lonetree's and Officer Risley's initial intrusion into Ms. Wofford's home was lawful because they had consent or because exigent circumstances were prevailing at the time of their initial entry. These exceptions to the warrant requirement simply do not cover their intrusion.

Nonetheless, we conclude that Sergeant Lonetree's and Officer Risley's entry into Ms. Wofford's home was lawful and that their seizure of evidence may have been valid under the plain-view exception. In reaching this conclusion, we rely on the holding in *La Fournier v. State*, 280 N.W.2d 746, 751 (Wis. 1979), that, where the police enter a private residence in accordance with the emergency exception but are unable to preserve the evidence that they observe in plain view while rendering assistance, a second entry by other officers without a warrant is lawful, even though the emergency has passed, if the search that follows is restricted in nature and scope to securing the evidence observed in plain view by the officers who entered pursuant to the emergency exception.

Other courts have found the rationale of the Wisconsin court persuasive and have relied on it to uphold certain warrantless "second entries" made by the police following the termination of the emergency that justified an initial entry. *See, e.g., Hunter v. Commonwealth*, 378 S.E.2d 634 (Va.App. 1989); *Smith v. State*, 419

So.2d 563 (Miss. 1982), *cert. denied*, 460 U.S. 1047 (1983), *over-ruled on other grounds, Willie v. State,* 585 So.2d 660 (Miss. 1991). *See also State v. Tidwell,* 888 S.W.2d 736 (Mo.App. S.D. 1994); *State v. Jolley,* 321 S.E.2d 883 (N.C. 1984); *State v. Norman,* 302 S.2d 254 (Miss. 1974).

 The facts in the case at bar are analogous to those in the *La Fournier* case and the other cases cited above. Officers Ohm and Boyd, Jr., made a valid emergency entry into Ms. Wofford's home. They secured the crime scene and called for assistance, and Sergeant Lonetree and Officer Risley arrived within a reasonable amount of time to process the crime scene and complete the search begun by Officers Ohm and Boyd, Jr. If Sergeant Lonetree and Officer Risley seized only evidence that was observed by Officers Ohm and Boyd, Jr., in plain view without expanding the scope and nature of the initial entry made by Officers Ohm and Boyd, Jr., then the seizure was proper. The record does not establish that the evidence seized by Sergeant Lonetree and Officer Risley was in fact observed in plain view by Officers Ohm and Boyd, Jr. Thus we must remand for the Trial Court to make that determination. *See State v. Spears,* 560 So.2d 1145 (Ala. Cr. App. 1989); *People v. Reynolds,* 672 P.2d 529 (Colo. 1983).

Ms. Wofford next contends that the plain-view exception cannot apply here because Sergeant Lonetree's and Officer Risley's discovery of the evidence was not inadvertent. Ms. Wofford points us to Sergeant Lonetree's testimony that he arrived at the crime scene and entered the house for the very purpose of collecting evidence. Thus, says Ms. Wofford, his discovery of evidence inside the house was intentional rather than inadvertent.

 In a different case, Ms. Wofford's argument might be persuasive. We have said that another of the prerequisites for applying the plain-view exception is that the discovery of the evidence must be inadvertent. *See Williams v. State, supra; Johnson v. State, supra.* Here, the record clearly supports Ms. Wofford's contention that Sergeant Lonetree's and Officer Risley's discovery of the evidence in question was anything but inadvertent. It is clear to us, however, that the inadvertency requirement applies to the

initial officers' observations and not to those of officers who follow. Again, if the items seized were inadvertently viewed by Officers Ohm and Boyd, Jr., then it does not matter that the later officers entered the house with the purpose of seizing them.

The Supreme Court of the United States has held that "inadvertence" is not a "necessary condition" for application of the plain-view exception in any type of case brought under the Fourth Amendment. *Horton v. California,* 496 U.S. 128 (1990). Thus, insofar as Ms. Wofford's "inadvertence" argument concerns the Fourth Amendment, the *Horton* case supplies a sufficient basis for rejecting the argument. However, Ms. Wofford's motion to suppress alleged that the seizure of evidence from her home also violated the Arkansas Constitution. We need not decide here whether we will follow the *Horton* case and dispense with the inadvertence requirement for all cases brought under the Arkansas Constitution. Thus, insofar as Ms. Wofford's inadvertence argument concerns only the Arkansas Constitution, we reject it because we believe it is unnecessary for an officer who enters a residence for the purpose of continuing another officer's search and collecting evidence that the other officer observed in plain view to discover the evidence inadvertently.

### 2. Ms. Wofford's statements

Ms. Wofford contends her statements should have been suppressed because (1) they were the fruits of the police's illegal entry into her home; (2) they were not preceded by adequate *Miranda* warnings; and (3) Ms. Wofford neither voluntarily, nor knowingly and intelligently, waived her constitutional rights before making the statements. Because we cannot say the Trial Court's ruling on the admissibility of Ms. Wofford's statements is clearly against the preponderance of the evidence, we affirm the ruling. *Norman v. State, supra.*

### a. Fruit of the poisonous tree

We already have established that the warrantless entry of Officers Ohm and Boyd, Jr., into Ms. Wofford's home was justified under the emergency exception contained in Ark. R. Crim.

P. 14.3(a). Thus, to the extent that Ms. Wofford's incriminating statements were the result of this entry, they are not inadmissible because the officers' entry into her home was not unconstitutional. We need not address this point further.

### b. Miranda *warnings*

When Ms. Wofford was taken by ambulance to the hospital emergency room, she was not under arrest. She was neither handcuffed nor told that she was a suspect in the death of her son. She rode in the ambulance unaccompanied by any police officer.

Officer Chitwood followed the ambulance in his patrol unit and arrived at the emergency room behind Ms. Wofford. He had not been instructed to arrest Ms. Wofford. The officer learned from an emergency medical technician that Ms. Wofford had said in the ambulance that she had cut her son's wrists.

Attendants at the hospital removed Ms. Wofford's clothes, glasses, and personal effects and changed her into a hospital gown. Although Officer Chitwood did not request them, he received Ms. Wofford's possessions and placed them in a paper bag next to where he was standing in the treatment room. He later placed the items into the police's evidence locker.

Officer Boyd, Sr., arrived at the hospital at some point thereafter. He had been asked to go to the hospital and talk with Ms. Wofford. Before he entered Ms. Wofford's treatment room, Officer Chitwood told him about the statement that Ms. Wofford had made in the ambulance. Nevertheless, Officer Boyd, Sr., testified that, at the time he began to question Ms. Wofford, he did not consider her a suspect in her son's death. He testified that, in light of the condition of the outside door leading to Ms. Wofford's bedroom and the area around the door, he had not ruled out the possibility that there had been an intruder. The officer wanted to question Ms. Wofford about who the perpetrator might have been.

Officer Boyd, Sr., confirmed with the attending doctor that Ms. Wofford's condition would permit a discussion with her. He then entered the treatment room. He was out of uniform, but he

was wearing his weapon. Also present in the room were Officers Chitwood, Colter, and Pitts, all of whom were uniformed and wearing their weapons. As Officer Boyd, Sr., entered the room, he heard the nurse ask Ms. Wofford if she was all right and Ms. Wofford respond that she was. The nurse also asked Ms. Wofford if she knew where she was, and Ms. Wofford answered that she was in a hospital. Officer Pitts left the treatment room shortly after Officer Boyd, Sr., arrived there.

Officer Boyd, Sr., began to question Ms. Wofford. He initially asked Ms. Wofford if she was all right and told her that he needed to talk to her about what had happened at her house. Ms. Wofford indicated that would be "okay." The officer testified that Ms. Wofford did not appear reluctant to speak with him. She answered the questions and provided him with general information about her name, address, date of birth, and the name and age of her son. She told the officer that her son attended kindergarten. Ms. Wofford also told Officer Boyd, Sr., where she worked, how long she had worked there, and that she had worked the day before but was missing a shift on the day in question. Officer Boyd, Sr., then asked Ms. Wofford what had happened to her son. She answered, "I did it. I killed him, that's why I'm going to prison." Prior to making this statement, Ms. Wofford had not received *Miranda* warnings.

Ms. Wofford's surgeon then entered the treatment room and readied her for surgery. When the surgeon left, Officer Boyd, Sr., resumed his interrogation. He told Ms. Wofford that he needed to discuss what had happened at her house and that he would need to advise her of her rights. He asked Ms. Wofford if she understood that, and she answered that she did. The officer asked Ms. Wofford about her education and verified that she could read and write and that she had a high school diploma. She said she understood what he was saying to her. The officer testified that he then gave Ms. Wofford the following *Miranda* warnings:

> I advised her that she had the right to remain silent. That anything she said can and will be used against her in court. I advised her that she had a right to an attorney present before, during or after questioning, and that if she could not afford one, then the

Court would appoint one at no cost to her before any questioning if she wished.

Thereafter, Officer Boyd, Sr., asked Ms. Wofford if she understood the warnings, and she answered affirmatively.

After advising Ms. Wofford of her rights, Officer Boyd, Sr., again asked her what had happened. Ms. Wofford answered that she killed her son and attempted to set fire to the house so that Mark's father would not get it. She told the officer that she and Mark did not like the fact that Mark's father had obtained visitation rights. She confessed that she killed her son so that he would not have to see his father. Ms. Wofford explained that she had smothered her son to death by placing her hand over his mouth and nose during the previous night. The surgeons then came to take Ms. Wofford to surgery, and Officer Boyd, Sr., terminated the interrogation without arresting Ms. Wofford.

 Ms. Wofford now contends that the Trial Court should have suppressed her initial incriminating statement because it was not preceded by *Miranda* warnings. *Miranda* warnings are required only in the context of custodial interrogation. *Solomon v. State,* 323 Ark. 178, 913 S.W.2d 288 (1996); *State v. Spencer,* 319 Ark. 454, 892 S.W.2d 484 (1995). The question here is whether Ms. Wofford was "in custody" at the time she made her initial incriminating statement in response to the officer's interrogation. We hold that she was not in custody.

 A person is "in custody" for purposes of the *Miranda* case when he or she is

deprived of his freedom of action by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation.

*Solomon v. State,* 323 Ark. at 186, 913 S.W.2d at 292 (citation omitted). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

being interrogated." *State v. Spencer,* 319 Ark. at 457, 892 S.W.2d at 486.

 A reasonable person in Ms. Wofford's situation could not have believed that she was restrained *by the police* prior to the time she made her initial incriminating statement. Ms. Wofford had been taken to the hospital on account of her injuries and was not escorted there by the police. When the police entered her room, they neither arrested her nor indicated in any manner that she was a suspect. Officer Boyd, Sr., specifically testified that he did not view Ms. Wofford as a suspect during this segment of the interrogation and that he suspected that an intruder might have been responsible. Ms. Wofford suggests that the officer did in fact suspect her from the outset of his questioning. We point out that "an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody." *Stansbury v. California,* 511 U.S. 318, 319 (1994). *See State v. Spencer, supra.* Even if Officer Boyd, Sr., did harbor suspicions about Ms. Wofford, nothing in the record suggests such a viewpoint was communicated in any way to Ms. Wofford.

Although three of the officers in the room were in uniform, and although *all* of the officers wore their weapons, none of them restrained Ms. Wofford or threatened her with the weapons, and only one of them, Officer Boyd, Sr., confronted Ms. Wofford with any questions. The tone of the questions, moreover, does not appear to have been hostile or antagonistic, and the duration of the questioning was brief. In addition, hospital personnel had, and appear to have exercised, access to the treatment room throughout a portion of the interrogation.

 Finally, we point out that, while Ms. Wofford's freedom of movement may have been restrained somewhat during the interrogation, that confinement resulted only from the hospitalization that was necessary in light of her injuries rather than from any conduct on the part of the police. As other courts have recognized, "confinement to a hospital bed is insufficient *alone* to constitute custody." *People v. Milhollin,* 751 P.2d 43, 50 (Colo. 1993)(emphasis added)(citations omitted). We agree with the

Supreme Court of Delaware that "there is no *per se* 'hospital rule' in a custody inquiry because each case must be decided on its own facts." *DeJesus v. State,* 655 A.2d 1180, 1191 (Del. 1995). In the absence of other indicia of custody, we cannot say that Ms. Wofford's health-related confinement alone produced a custodial situation because her confinement was not the result of police compulsion. Given the totality of the circumstances, we cannot say that the Trial Court erred in concluding that Ms. Wofford was not in custody at the time she made her first incriminating statement.

Ms. Wofford also contends that the Trial Court should have suppressed her second incriminating statement that she made after receiving *Miranda* warnings from Officer Boyd, Sr. She maintains that the warnings were deficient because they failed to apprise her that she had the right to terminate the interrogation at any time.

Even if we could assume, and we need not do so, that Ms. Wofford was in custody after she confessed she had killed her son, we cannot say that the warning given to her was deficient. The *Miranda* case establishes that a defendant has a right to cut off questioning, but it does not require the police to give a warning advising a defendant of this particular right. Although certain passages in the opinions of this Court and the Supreme Court of the United States have suggested that such a warning is required or at least desirable, *see Colorado v. Spring,* 479 U.S. 564, 574 (1987); *Oregon v. Elstad,* 470 U.S. 298, 315 n.4 (1985); *Mauppin v. State,* 309 Ark. 235, 247, 831 S.W.2d 104, 110 (1992), *quoting Colorado v. Spring, supra; Bushong v. State,* 267 Ark. 113, 122, 589 S.W.2d 559, 564 (1979), neither Ms. Wofford nor our own research has produced a case actually *holding* that such a warning is required by the *Miranda* decision. In fact, many courts have considered this question and have held that the police are not required to give the warning proposed by Ms. Wofford. *See, e.g., State v. Fecteau,* 568 A.2d 1187 (N.H. 1990); *Commonwealth v. Lewis,* 371 N.E.2d 775 (Mass. 1978); *United States v. Davis,* 459 F.2d 167 (6th Cir. 1972). *But see United States v. DiGiacomo,* 579 F.2d 1211, 1214 (10th Cir. 1978)(stating that the warning is not required under *Miranda* but that the failure to give it could be a factor in determining whether custodial statements are voluntary).

Although we agree with the Supreme Judicial Court of Massachusetts that it is "the better practice" for the police to advise an arrested person that he or she may cut off questioning at any moment, *Commonwealth v. Lewis,* 371 N.E.2d at 777, we are not prepared to say that Officer Boyd, Sr.'s failure to give it to Ms. Wofford violated the Supreme Court's holding in the *Miranda* case.

### c. Waiver

Finally, Ms. Wofford contends that the Trial Court should have suppressed her statements because they did not follow a voluntary waiver of her rights or a knowing and intelligent waiver of her rights. The Trial Court ruled that the waiver was voluntary but did not rule on the issue of whether the waiver was also knowing and intelligent. We have recognized that the question of voluntariness and the question of a knowing and intelligent waiver are distinct and separate inquiries. *See Mauppin v. State, supra.* Thus, the Trial Court's ruling with respect to the voluntariness issue could not have encompassed Ms. Wofford's argument that she did not knowingly and intelligently waive her constitutional rights. Because she failed to obtain a ruling on that discrete issue, it is not preserved for appeal, and we do not address it. *Bowen v. State,* 322 Ark. 483, 911 S.W.2d 555, *cert. denied,* 116 S. Ct. 1861 (1996).

A statement must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Mauppin v. State,* 309 Ark. at 246-47, 831 S.W.2d at 109 (1992), *quoting Moran v. Burbine,* 475 U.S. 412, 421 (1986).

> When voluntariness of a statement is an issue, we make an independent determination based on the totality of the circumstances surrounding the statement. We will reverse the ruling of the trial court only if that ruling was clearly against the preponderance of the evidence. A custodial statement is presumed involuntary, and the burden is on the state to show that the statement was voluntarily given. . . . . In making a determination of whether a statement was voluntarily made, this court will consider many factors, among which are the age, education and

intelligence of the accused; the length of questioning; the advice or lack of advice on constitutional rights; the repeated or prolonged nature of questioning; and the use of mental or physical punishment.

*McCoy v. State,* 325 Ark. 155, 160, 925 S.W.2d 391, 393-94 (1996) (citations omitted). *See also Stephens v. State,* 328 Ark. 81, 85, 941 S.W.2d 411, 413-14 (1997).

█ The testimony at the suppression hearing supports the Trial Court's ruling finding Ms. Wofford's statement to be voluntary. There was no testimony of police-sponsored coercion or duress or any other type of misconduct. Although Ms. Wofford may have been in a weakened physical or mental condition at the time of making her statements, that fact would not render the statements involuntary absent a finding of police misconduct. *See Stephens v. State, supra.* Although Ms. Wofford may have been dazed earlier in the day, and although the medical evidence indicates she suffered from depression, the testimony of Officers Chitwood and Boyd, Sr., shows that Ms. Wofford was alert in the treatment room and able to converse coherently with those around her. The questioning was preceded by adequate *Miranda* warnings where necessary, and it was not unduly long. Ms. Wofford obtained a high-school education and was holding down a job. In these circumstances, we cannot say that the Trial Court's ruling that the statements were voluntarily made is clearly against the preponderance of the evidence.

### 3. Rule 4-3(h)

█ In closing, we note that, in the typical case involving a life sentence, we would ordinarily examine the record pursuant to Ark. Sup. Ct. R. 4-3(h) to determine whether there were other rulings not briefed by the parties that constituted prejudicial error. We have not done so in this case, as it arises from a conditional plea of *nolo contendere.* As mentioned above, we have reviewed only the adverse determination of Ms. Wofford's pretrial motion to suppress evidence. Ark. R. Crim. P. 24.3(b). In appeals from pleas of guilty or *nolo contendere,* we are not required to undertake the additional review prescribed by Rule 4-3(h). *Smith v. State,* 321 Ark. 580, 906 S.W.2d 302 (1995).

■ We remand the case to the Trial Court to conduct an additional hearing to determine whether Officers Ohm and Boyd, Jr., observed in plain view the items later seized by Sergeant Lonetree and Officer Risley. The transcript of the hearing shall be forwarded to this Court along with the Trial Court's written findings.

Remanded.