Aaron Michael HODGE *v.* STATE of Arkansas

CR 97-406 965 S.W.2d 766

Supreme Court of Arkansas
Opinion delivered March 26, 1998

*Alan Copelin* and *David Copelin,* Public Defenders, for appellant.

*Winston Bryant,* Att'y Gen., by: *C. Joseph Cordi, Jr.,* Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. This is a capital-murder case in which Aaron Michael Hodge, who was seventeen years old at the time of the crime, was convicted of shooting to death his mother, Barbara Flick, his stepfather, David Flick, and his half-sister, Andria Flick in their home at Rector. Mr. Hodge was sentenced to life imprisonment without parole for each of the killings. He raises numerous points of appeal to be discussed below, but none of them presents reversible error; thus, we affirm the convictions.

In his testimony at the trial, Mr. Hodge admitted that he had taken Mr. Flick's pistol from Mr. Flick's place of business and returned to the home where he lived with the victims. His testimony was that Mr. Flick found him with the pistol and summoned him to their living room to talk. At that point, he informed Mr. Flick that Ms. Flick was leaving Mr. Flick and that he, Aaron Hodge, had won the long-standing battle between them for his mother's affection. He said that he then left the home and that, when he returned, he found Mr. Flick lying on the couch making a loud "snoring" noise. Mr. Hodge said that he went to check on his mother and sister and found them in their respective bedrooms shot to death. He said that he returned to the living room where Mr. Flick was and shot him twice with the pistol in retaliation for Mr. Flick's having presumably killed Mr. Hodge's mother and sister. The implication of that trial testimony was that Mr. Flick had committed suicide after killing his wife and daughter. A further implication is that Mr. Flick was already dead from a self-inflicted gunshot wound when Aaron Hodge shot him. The contrary evidence presented by the State is the subject of Mr. Hodge's first point of appeal, which raises the issue whether his motion for a directed verdict should have been granted on the ground that the evidence was not sufficient for presentation to the jury.

## 1. Sufficiency of the evidence

During the week prior to October 14, 1995, the interest of the Rector Police Department in the welfare of the Flick family was aroused by telephone calls, received initially from persons in Florida who were expecting some or all of the family to arrive for a visit, and later from local persons who had been alerted by the friends in Florida. A friend of Barbara Flick first alerted the police to the fact that the Flicks had not arrived in Florida and that she was concerned for their well being.

Officer Audrey Emberton testified that the police were aware that Mr. Hodge was driving Mr. Flick's pickup truck and was in Paragould. He was in Paragould attending Friday-night home-coming festivities on the evening of October 13. The Paragould Police were notified, and they located Mr. Hodge. Officer Emberton went to Paragould to interview him. When the officer arrived after 1:00 a.m. on Saturday, October 14, Mr. Hodge was at the Paragould police station. When asked about his family, he reported that he had heard from them, although not that day, and that they were to return later that day. The officer thanked him for the information and left.

Officers Pruett and Emberton knew that Mr. Hodge had returned to the home and was up at around 3:00 a.m. They knocked on the door to a garage room or apartment at the Flick home, and Mr. Hodge invited them in. He told them that he had not heard anything further from the Flicks. When asked if he lived in the main part of the house, he replied that it was locked and that he could not get in. Officer Pruett apparently had looked in a window of the main dwelling, and he mentioned that there seemed to be some sheets on the floor. To that, Mr. Hodge responded that there was some remodeling in progress.

Officers went to Mr. Flick's transmission shop to see if they could find any information that might lead to the family's whereabouts. They were accompanied by one of Mr. Flick's employees who had told them he could let them into the building for that purpose. The employee was able to enter the building by moving a metal panel at the rear. Once inside, he noticed that a tool box

appeared to have been forced open and that money and the pistol that had been there were missing.

Later that morning, around 10:00 a.m., Officer Glenn Leach drove past the Flick home and saw Mr. Hodge and Mr. Hodge's friend, David Gunn, standing by the front door. He pulled in the driveway and told the young men that the police needed to know something about the family, as they continued to receive calls expressing concern. Mr. Hodge replied that he would "tell [him] about it at City Hall." Mr. Hodge got in the police vehicle. Officer Leach asked if he could go in the main portion of the house to check on the family, and Mr. Hodge said, "No."

When Officer Leach and Mr. Hodge arrived at City Hall, Mr. Hodge asked to be taken to a room where they could speak privately. Officer Leach complied and reiterated that the calls were still coming in and that he had to know something about the family. Mr. Hodge replied that they were in the house. When asked if they were alright, Mr. Hodge replied, "They're dead." He said he had found them in that condition earlier in the week. When asked why he had not told anyone, Mr. Hodge replied, "I was waiting to hear." The officer informed Mr. Hodge that he had to go and check the house, and Mr. Hodge told him that the outer door was unlocked but that the inner door to the main house was locked.

Officer Leach left Mr. Hodge with the police dispatcher and went immediately to the Flick home where he forced open the inner door, after entering through the garage-apartment area, and found the bodies in advanced stages of decomposition. There were sheets, blankets, and pillows arrayed about the floor and the couch area in the living room. He pulled back a cover on the couch and found blood. Moving through a hallway back to the bedroom area, he saw more stains that appeared to be blood. It appeared to him that a body had been dragged from the couch area back into the bedroom area. He also found one spent .38-caliber cartridge on the floor near a waste basket and four additional cartridges in an open desk drawer in a bedroom obviously occupied by Mr. Hodge.

David Gunn testified that Mr. Hodge came to him and asked him to drive Mr. Hodge to Mr. Flick's transmission shop at 11:00 p.m. on Sunday, October 8, 1995. Keys in Mr. Hodge's possession did not unlock the door, so he "broke in" and broke open a tool box, finding $30, which he took. He had expected to find more money. He also took a pistol, holster, and shells from the tool box. He loaded five of the shells in the pistol. Mr. Hodge and Mr. Gunn then drove to a cemetery, and Mr. Hodge got out of the vehicle there and said he needed to "think." Shortly thereafter, he returned to the car, and they returned to Mr. Gunn's home. Mr. Hodge walked to his home, carrying the pistol. The next time Mr. Gunn saw Mr. Hodge was when the latter showed up at school on the following Monday, driving Mr. Flick's truck.

More than one witness testified that it was understood that Mr. Hodge did not have permission to drive the truck and that it was unusual for him to be driving it. Mr. Hodge drove the truck during the ensuing week and took his friends to the movies and rode around Rector, Paragould, and Jonesboro in the truck. The succeeding week saw a good deal of partying in the garage apartment at the Flick home with Mr. Hodge. There was testimony about smoking marijuana and drinking alcohol by a number of young people in the apartment. One young woman testified to sleeping with and having sexual relations with Mr. Hodge during that time. Testimony showed that Mr. Hodge used Mr. Flick's credit card and business checks to obtain cash and make purchases during the week. There was testimony that Mr. Hodge appeared calm and "normal" during that time and that he remarked it was "the best week of [his] life" because he had plenty of money to spend and a nice vehicle to drive about. He made more than one such remark during that week.

After the corpses were found, Mr. Flick's truck, which was parked in the driveway of the Flick home, was searched. Bloody clothing was found in the truck along with a pillow that appeared to have a gunshot hole in it.

A State Police investigator interviewed Mr. Hodge. He did not admit to having killed his family but equivocated about

remembering what had happened and whether he "could have" done it.

In addition to Mr. Hodge's testimony that he hated his stepfather and was "out of control," in the sense that he had begun walking away from the domestic situation rather than be a part of the continuous conflict among himself, his mother, and his stepfather, there was testimony that Barbara and David Flick were afraid of Mr. Hodge. Darlene Bowlin, a friend of Barbara Flick who visited in the home, testified that David Flick had expressed to her his fear of Mr. Hodge and "what was going to happen" and that Barbara Flick had expressed her fear earlier.

David Gunn testified that Mr. Hodge had told him some six months earlier of a plan to kill Mr. Flick by striking him on the head with a wrench and burying the body. Mr. Hodge said he would then drive the pickup truck and report later that Mr. Flick was "missing."

There was testimony that David Flick was right-handed. Lisa Sacevicius of the State Crime Laboratory testified that his left hand tested positive for gunshot residue and that his right hand tested negative but had some residue on it. She also found gunshot powder residue on two pillows submitted for examination. She said Mr. Flick could have fired a weapon or the residue could have been rubbed off on him if his body were dragged away by some person who had it on him.

The defense theory of the case was that David Flick killed Barbara and Andria Flick and then himself. It is argued that the testimony by crime laboratory personnel about the gunshot residue found on the hands of Mr. Flick supports the suicide theory because he could have cradled the pistol in his left hand and fired it with his right after using the pillows to muffle the sound when he shot the two females.

 Our standard of review of an allegation that a directed verdict should have been granted is that we consider the evidence in the light most favorable to the appellee and affirm if there is substantial evidence in support of the verdict. *Kemp v. State,* 324 Ark. 178, 919 S.W.2d 943 (1996); *Misskelley v. State,* 323 Ark.

449, 915 S.W.2d 702 (1996). Circumstantial evidence may constitute sufficient evidence to sustain the conviction,

> [b]ut it must give rise to more than suspicion and the fact finder must not be left to speculation and conjecture in arriving at its conclusions on the question. *Upton v. State,* 257 Ark. 424, 516 S.W.2d 904 [1974]. It is the duty of this court to set aside a judgment based upon evidence that did not meet the required standards and left the fact finder only to speculation and conjecture in choosing between two equally reasonable conclusions, and merely gave rise to a suspicion of guilt. *Jones v. State,* 246 Ark. 1057, 441 S.W.2d 458 [1969].

*Smith v. State,* 264 Ark. 874, 880, 575 S.W.2d 677, 681 (1979).

Mr. Hodge's argument is that there is no evidence of premeditation on his part and that the evidence does not exclude his hypothesis of Mr. Flick committing suicide after shooting Barbara and Andria Flick.

 As to Mr. Hodge's hypothesis, we agree with the State's argument that it is "preposterous" to consider that Mr. Hodge was so distraught over the shooting deaths of his mother and sister, of whom he purported to be very fond, that he shot Mr. Flick twice in the head after perceiving him to be dead and then, after trying to cover up the bodies and the blood, engaged in a week of partying without reporting to the authorities what had happened. We also agree with the proposition that the jury was not required to believe the testimony of Mr. Hodge but was free to find his testimony incredible. *Allen v. State,* 327 Ark. 350, 939 S.W.2d 270 (1997); *Jones v. State,* 326 Ark. 61, 931 S.W.2d 83 (1996).

 The definition of capital murder, as charged in this case, is found in Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997). It provides that one is guilty of capital murder if, "[w]ith the premeditated and deliberate purpose of causing the death of another person, he causes the death of any person." With respect to the evidence of premeditation and deliberation, we have held that the nature of the weapon used, and the nature, extent, and location of the wounds inflicted, may supply the required evidence. *Kemp v. State, supra.* Given the jury's apparent conclusion that Mr. Hodge

shot the victims in their heads with a firearm, causing their deaths, the evidence of premeditation and deliberation was sufficient.

### 2. Suppression of physical evidence
#### a. The house

Mr. Hodge moved to suppress evidence seized from the Flick home, from Mr. Flick's transmission shop, and from Mr. Flick's truck, and to suppress still and video photographs taken in the home and the shop. Although there is a suggestion that Mr. Hodge ultimately consented to Officer Leach's entry into the home by explaining to him the manner in which he would have to gain entrance to the home, we need not consider the consent issue. Rather, we agree with the State's position that the officer was allowed to enter and to seize that which was in plain view because of exigent circumstances. Such an entry is permitted in accordance with Ark. R. Crim. P. 14.3, but any subsequent search and seizure is limited to that which is in plain view and observed incident to the entry in response to the emergency. *Mincey v. Arizona,* 437 U.S. 385 (1978).

In *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646 (1997), the evidence showed that officers entered Ms. Wofford's home without a search warrant because of information that she was injured, bleeding, and in danger. A relative of Ms. Wofford had previously been in the home and had informed the officers that Ms. Wofford's son was in Ms. Wofford's bedroom and that she believed the son to be dead. After attending to Ms. Wofford, of whose condition they had been made aware, one of the officers went through the rest of the residence and found Ms. Wofford's son's corpse. Ms. Wofford was convicted of first-degree murder, and on appeal she argued that the exigent circumstances did not justify the entry into her bedroom because the exigency no longer existed, *i.e.,* that there was no justification to enter the bedroom because the officer had been informed that the son was dead.

In affirming the conviction, we held that the entry into Ms. Wofford's bedroom was justified because, quoting *Patrick v. State,* 227 A.2d 486 (Del. 1967), "[f]requently, the report of a death proves inaccurate and a spark of life remains, sufficient to

respond to emergency police aid." *Wofford v. State,* 330 Ark. at 19, 952 S.W.2d at 651. We reach the same conclusion here. Mr. Hodge's report that the members of his family were dead, and his cryptic statement that he had not reported it because he was "waiting to hear," surely made it incumbent upon Officer Leach to go immediately to the scene to ascertain the situation and whether there might be some hope that one or more of the victims might still be alive.

In *Mitchell v. State,* 294 Ark. 264, 742 S.W.2d 895 (1988), we reached the opposite conclusion, but the facts were different. There the police had received an anonymous telephone call about a dead body inside a house. They went to the house, and a neighbor was asked if he had heard any gunshots. He replied he had not. The police entered and found a body. We held that the entry was not justified by exigent circumstances and implied that the anonymous telephone call and the lack of any other evidence that there was a body in the house was not sufficient to suggest anyone in the house was in need of aid.

In this instance, however, we have substantial evidence that three members of Mr. Hodge's family were missing; his statement that they were dead and had been in the house several days; his initial refusal to allow anyone to enter; and his cryptic statement that he had not reported it because he was waiting to hear.

Mr. Hodge argues that a factor in the exigent-circumstances review is the overpowering smell of the decaying corpses that Officer Leach encountered progressively as he entered the house, indicating that those inside were dead. The fact that the officer might thus have suspected that he would encounter at least one or two corpses did not make it inconceivable that one or two of the victims might have been alive.

### b. The shop and the truck

Mr. Hodge also challenges the search of Mr. Flick's transmission shop and of the pickup truck because it was parked in the curtilage of the house and thus, he claims, was protected against a warrantless intrusion. Mr. Hodge was not the owner of the shop or the truck and thus had no standing to challenge the

search on the basis of a proprietary interest in either. He had no reasonable expectation of privacy in either the shop or the truck. *Rawlings v. Kentucky*, 448 U.S. 98 (1980). *See Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (1992).

■ As to the argument that he could expect privacy in the truck because it was situated on the curtilage of his home, he cites only authority to the effect that a building or structure or a garden in the curtilage falls within that protection, not a vehicle belonging to some other person.

### 3. Suppression of the October 14 statements

Mr. Hodge argues that he was "seized" when Officer Emberton spoke with him in Paragould, when Officers Pruett and Emberton spoke with him at his residence some two hours later, and when he spoke with Officer Leach and volunteered to speak further with him at City Hall. His contention is that his statements made on those occasions, and any evidence obtained as a result of them, were inadmissible because he was given no *Miranda* warnings. There simply is no evidence that Mr. Hodge was a suspect on any of those occasions or that he was involuntarily present when any of those conversations occurred.

The only instance that might be questionable is Officer Emberton's encounter with Mr. Hodge at the Paragould police station. She testified that she assumed he had been "asked" to be there in response to the Rector police request. There is no evidence that the Paragould police had forced Mr. Hodge to accompany them to the station. He was not in handcuffs and was standing by himself with no officers in his presence. Mr. Hodge's abstract of the record reveals nothing about how he came to be present at the Paragould police station, and we are unwilling to speculate on what the facts may have been.

■ We view the issue of whether one has been seized by considering the totality of the circumstances. *State v. Bell*, 329 Ark. 422, 948 S.W.2d 557 (1997). None of the instances complained of here have been shown to have constituted a seizure; thus the evidence of the statements given by Mr. Hodge on those occasions was admissible.

### 4. Suppression of October 27 statement

Rector Chief of Police Tommy Baker drove Mr. Hodge from Rector to Corning for a hearing on October 27, 1995. There is no evidence that Chief Baker initiated any conversation with Mr. Hodge by asking a question of him. To the contrary, Chief Baker testified that Mr. Hodge insisted on speaking to him even though he told Mr. Hodge that his lawyers would not want him to do so.

During the trip, Mr. Hodge asked if the gun had been found. The Chief replied that it had not. Mr. Hodge indicated he could show the police the location of the holster he had discarded from the car driven by David Gunn shortly after the pistol was stolen from Mr. Flick's shop. He said it was "across from the cemetery." Chief Baker asked, "Across where," and Mr. Hodge explained further. The Chief and a State Police officer went to the cemetery and found the holster where Mr. Hodge said it would be.

■ Mr. Hodge contends that the statement and the holster should have been suppressed because the Chief initiated the conversation without giving any warning and "steered the conversation" and "interrogated" Mr. Hodge. The evidence is simply to the contrary. In addition, Mr. Hodge testified at his trial that he had David Gunn throw the holster out of the car in which they were riding because it made the gun too bulky. There clearly was no unfair prejudice resulting from the introduction of the holster into evidence.

### 5. Suppression of photographs and videotape

■ Mr. Hodge contends it was error to allow introduction of photographs showing the decomposing bodies of the victims as they were found by the police as well as the photographs of the blood found on the couch where Mr. Flick apparently lay when he was shot, the bloody pillows apparently used to muffle the gunshot sounds, and the blood trail down the hallway of the house. The photographs of the bodies are, no doubt, gruesome, but that does not automatically require their exclusion from evidence. *Jones v. State,* 329 Ark. 62, 947 S.W.2d 339 (1997).

In support of his argument, Mr. Hodge cites *Berry v. State,* 290 Ark. 223, 718 S.W.2d 447 (1986), a decision in which we held that autopsy photographs of a murder victim should have been suppressed because their prejudicial effect outweighed their probative value. The distinction here is that the photographs in the *Berry* case had very little if any probative value, but the photographs in this case showed the positions of the bodies as they were found and depicted the efforts of the killer to cover up the bodies and the blood.

The still photographs were not cumulative to each other. While the videotape showed some of the same scenes as those depicted in the still photographs, it gave different perspectives. The Trial Court refused to allow the jury to see that part of the video tape showing the removal of the bodies from the house. He also excluded the autopsy photographs. There was no need, as contended by Mr. Hodge, for the Trial Court to require alternative pictures, such as drawings or black-and-white photographs instead of the color ones, because the photographs and the videotape were relevant. We cannot say their prejudicial effect outweighed their probative value. Ark. R. Evid. 403.

### 6. Closure of pretrial hearing

Mr. Hodge's counsel asked that a pretrial hearing be closed to the public on the ground that motions concerning the admissibility of evidence were to be considered and that the resulting publicity would be prejudicial to Mr. Hodge's case. The Trial Court denied the motion, citing *Memphis Publishing Co. v. Burnett,* 316 Ark. 176, 871 S.W.2d 359 (1994), a case over which he had presided and which resulted in a reversal due to a closed pretrial hearing.

Mr. Hodge does not contend that the Trial Court lacked the authority, within his discretion, to hold the hearing open to the public. The decision is indeed within the discretion of a judge, and a hearing may be closed if it will result in irreparable damage to a party. *Arkansas Television Co. v. Tedder,* 281 Ark. 152, 662 S.W.2d 174 (1983). The argument here is that the deci-

sion was only a reaction to the *Memphis Publishing Co.* case and that no discretion was exercised.

 To the contrary, the Trial Court invited proof of the prospect of irreparable harm to Mr. Hodge and stated that he would reconsider the matter if it appeared at the hearing in question that it should be closed. No error occurred on this point.

### 7. *Ms. Bowlin's testimony*

There was a motion *in limine* to suppress the testimony of Darlene Bowlin that Mr. and Ms. Flick had told her that they were afraid of Mr. Hodge. The motion was denied. It is contended that the statements were irrelevant, too remote in time, and unfairly prejudicial. The State argues the statements are particularly important and relevant in view of its right to prove Mr. Hodge had a motive or plan for killing his mother and stepfather and in view of the fact that the other evidence was circumstantial.

 The statement made to Ms. Bowlin by Mr. Flick was hardly remote in time, as it was made some three weeks before the deaths occurred. The statement by Ms. Flick had occurred some two months prior to that time. They were not hearsay evidence because they were statements by declarants of their present states of mind and thus fell within an exception to the hearsay rule. Ark. R. Evid. 803(3).

With respect to the relevancy of the statements, Mr. Hodge's counsel cite a passage from a motion for rehearing quoted in a supplemental opinion accompanying the denial of rehearing in *Vasquez v. State,* 287 Ark. 468, 473A–474, 702 S.W.2d 411 (1986). The quoted passage was itself a quotation from McCormick on Evidence, § 296, pp. 853–854 (3d ed. 1984), in which it was recognized that an expression of fear falls within the hearsay exception of Rule 803(3). It continues to point out that statements such as "I am afraid of D" are rare and that the usual case is "D had threatened me." The treatise condemns the latter because it would probably be used by the jury to punish the defendant for a specific act. The instant case is the "rare case" of which the passage speaks. What we have here are mere statements of the declarants' fear of Mr. Hodge, and neither the *Vasquez* case nor

the passage from McCormick can be said to require that we exclude the statements on the basis of their irrelevancy.

█ Relevancy-of-evidence decisions are within the discretion of the Trial Court, *Dixon v. State,* 311 Ark. 613, 846 S.W.2d 170 (1993), and we cannot say that discretion was abused in this instance.

### 8. Rule 404(b)

Mr. Hodge argues that the introduction of evidence of his party behavior, including the use of alcohol and marijuana, his engaging in sexual relations with a teenaged girl, and his unauthorized use of his stepfather's credit card and business checks to obtain cash and goods was error in violation of Ark. R. Evid. 404(b).

█ The evidence was admitted by the Trial Court who quoted from the rule to the effect that a defendant's bad acts may be introduced if they tend to prove the defendant's motive for the crime at hand. The State contends that at least a part of Mr. Hodge's motive in killing his victims was his desire to engage in a "hedonistic lifestyle." Again, we cannot say that the Trial Court's application of Rule 404(b) was an abuse of discretion. That is the standard we apply in reviewing decisions made pursuant to Rule 404(b). *Bragg v. State,* 328 Ark. 613, 946 S.W.2d 654 (1997).

### 9. Admissibility of audio-tape statement

The jury was permitted to listen to an audio tape of Mr. Hodge's statement made to the State Police investigator. There were a number of inaudible portions of the tape, some of which were apparently caused by the fact that Mr. Hodge was crying and placing the sleeve of his shirt in or over his mouth while the recording was being made. Mr. Hodge contends the inaudible parts may have been of exculpatory answers he was giving to the questions being asked.

There was no abuse of discretion, and, again, that is the standard we apply. *Hamm v. State,* 301 Ark. 154, 782 S.W.2d 577 (1990). As mentioned above, the statement was not *per se* inculpa-

tory. Mr. Hodge said, through his tears, that he could not remember what happened and felt he could not have committed the crimes. It was hardly as inculpatory or prejudicial as his testimony at the trial.

The Trial Court permitted the jurors to see a transcript of the tape as it was being played for them, but he did not allow them to take the transcript to the jury room during their deliberations. In addition, he admonished the jurors that they were to determine what they heard, and if the transcript varied from the audio tape, they were to follow the tape. Thus, to the extent the transcript may have varied from the tape recording, as Mr. Hodge contends, there was no prejudice.

### 10. The threat

When David Gunn was asked to testify about Mr. Hodge's statement that he had a plan to kill Mr. Flick, counsel for Mr. Hodge objected on the basis of irrelevancy and questioned the prosecutor as to when Mr. Hodge was supposed to have made the statement. The prosecutor replied he thought "within the last 2 or 3 months before this." The Trial Court announced he would allow the evidence if the statement was made within the previous two or three months. Defense counsel then stated his position that the evidence was irrelevant. Upon further examination, Mr. Gunn stated that Mr. Hodge told him of the plan some six months earlier. The objection was renewed.

On appeal, Mr. Hodge argues that it was error for the Trial Court to allow the evidence of the statement made six months ago after having ruled that he would admit it if the statement had occurred within the last two or three months. The State responds that there was no abuse of discretion in that the statement was relevant to the elements of premeditation and deliberation, *see* *Shankle v. State,* 309 Ark. 40, 827 S.W.2d 642 (1992), and cites a case in which a threat a year and a half before the event was held admissible. *Lang v. State,* 258 Ark. 504, 527 S.W.2d 900 (1975).

We do not see how it can be said that the evidence is irrelevant, and, in view of the *Lang* opinion, we are not troubled by the remoteness argument, assuming it was preserved at the trial.

### 11. Refusal of sex-paraphernalia evidence

When the police entered Mr. Flick's shop, they found and photographed certain sex paraphernalia. One of the photographs was introduced by the defense in connection with its proof that David and Barbara Flick slept separately; that she was having an affair with another man; and that Mr. Hodge was incensed over discovering the paraphernalia, which led to the argument to which he testified as having occurred on the evening of October 8.

The Trial Court excluded a second photograph of the paraphernalia because it was cumulative. Mr. Hodge simply states in his argument that the photograph was not cumulative without any description of the differences and the prejudice resulting from the photograph being held inadmissible. There was no abuse of discretion.

### 12. Exclusion of David Flick's criminal record

Mr. Hodge presented evidence that David Flick had been convicted of a felony in California. The conviction resulted from an automobile collision in which a woman was injured and Mr. Flick was found to have been driving under the influence of alcohol. There was also some evidence that Mr. Flick's probationary sentence was revoked and that he was incarcerated for 45 days in 1981.

The Trial Court correctly excluded the evidence because the conviction and Mr. Flick's last release from incarceration occurred more than ten years before the trial in this case. Ark. R. Evid. 609(b).

### 13. Testimony of Pam Suitt

Over Mr. Hodge's hearsay objection, the Trial Court allowed Pam Suitt to testify that David Flick and Mr. Hodge would not be making the trip to Florida to visit with Ms. Suitt because they could not get along. The Trial Court overruled the objection, citing Ark. R. Evid. 803(3), apparently because it was a statement of Ms. Flick's plan to visit.

 In view of Mr. Hodge's testimony about his relation-ship with Mr. Flick, and how he hated him, we can hardly say that the testimony was prejudicial.

### 14. Testimony of Courtney Simpson

Courtney Simpson, a friend of Mr. Hodge who rode in Mr. Flick's truck with Mr. Hodge on Thursday, October 12, testified that Mr. Hodge pulled a pistol out of the truck console and told him that he had the pistol in the truck in case someone tried to "fuck with" them. Mr. Hodge contends it was error to have allowed that testimony because it was irrelevant and improper character evidence, excludable pursuant to Rules 403 and 404(b). The only trial objection abstracted mentioned Rule 403. Thus, the only question we consider is whether the evidence was so unfairly prejudicial as to outweigh its probative value.

 Again, we hold there was no abuse of discretion. The evidence showed Mr. Hodge remained in possession of the pistol for several days after the killings occurred before disposing of it. The vulgarity of the statement did not make it unduly prejudicial.

### 15. Rule 4-3(h)

The record in this case has been examined for errors prejudicial to the defendant in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.