Timothy Dale SUMMERS  *v.*  STATE of Arkansas

CA CR 04-257                                        203 S.W.3d 638

Court of Appeals of Arkansas
Opinion delivered February 16, 2005

David O. Bowden, for appellant.

Mike Beebe, Att'y Gen., by: Kent G. Holt, Ass't Att'y Gen., for appellee.

OLLY NEAL, Judge. The Marion County Circuit Court found appellant, Timothy Dale Summers, guilty of manufacturing methamphetamine, possession of drug paraphernalia with the intent to manufacture, and possession of drug paraphernalia and sentenced him to sixty months' imprisonment. On appeal, appellant argues that "as a matter of law, the police lacked a reasonable suspicion of criminal activity at the time appellant's vehicle was stopped and the evidence flowing from the stop should have been excluded as 'fruit of the poisonous tree.' " He also argues that "the State failed to inform appellant of certain evidence gathered that was exculpatory as to his involvement in the crimes with which he was charged and therefore his motion for a new trial should have been granted." We reverse and remand.

The facts are that on September 30, 2002, the Mountain Home Police Department received information from Darrell Pace, the owner of Ozark Food, that a man came into the store and purchased a "large quantity of matches." Mr. Pace gave a description of the vehicle and the license plate number. Officer Jason Pace, the son of Darrell Pace, was dispatched to locate the vehicle. Officer Pace testified at trial that their department provided classes to business owners to make them aware of precursors for the

production of controlled substances. Officer Pace testified that his father had on previous occasions provided the local police with accurate and reliable information and that he had no reason to question the accuracy of this report.

Officer Pace located the vehicle exiting the parking lot of Harp's Grocery Store. Pace testified that his instruction from the assistant chief, Captain Lyle Scott, was "to stop the vehicle based on the information that had been given us." Officer Pace stopped the vehicle by Furniture Factory Outlet. Appellant was the driver of the vehicle. Officer Pace testified that he told appellant that he stopped him because he had reason to believe that appellant had purchased some items possibly for the manufacture of methamphetamine. Thereafter, Officer Pace requested consent to search the vehicle. Appellant gave consent. Officer Pace found matches inside the vehicle, but did not recall how many packages were found; he also found some cold tablets. Officer Pace testified that both matches and cold tablets are used in the production of methamphetamine. Officer Pace testified that appellant was subsequently arrested for driving on a suspended license.

Captain Scott testified that he received information on September 30, 2002, at 4:05 p.m. concerning the possible purchase of methamphetamine precursors from a local grocery store. Scott then left the station to look for the suspect. He testified that it was procedure for them to also look for the suspects by checking other area stores. Scott received a call from Officer Pace, whom he told to stop the suspect. Following the arrest, Scott took possession of the evidence. There was a brown Harp's Grocery Store bag that contained two boxes of Sudafed, and there was also a generic bag from a grocery store with two boxes of matches. Each box of Sudafed contained twenty tablets and each box of matches contained fifty match books. Both of these items, Scott stated, are used in the production of methamphetamine, with ephedrine being extracted from the Sudafed and red phosphorus being extracted from the striker plates on the matches. The receipt for the Sudafed was dated "9/30/02" from Harp's Grocery Store; the time indicated was 4:07 p.m. There was no receipt found with the matches.

Following his arrest, appellant admitted that he had additional narcotic-related items at his residence and consented to a search. Officers went to appellant's residence, where they found Liquid Fire, acetone, Coleman fuel, Red Devil lye, peroxide, Pyrex glassware, a measuring cup, coffee filters, a wooden stirrer, and four syringes containing residue. Police also found glassware

containing a bi-layered liquid and a plastic bottle with a hose attached that contained a white granular matter. This was recognized as a hydrochloric acid (HCl) generator that the police noted was "still active or smoking, indicating that a recent cook had taken place." Appellant was thereafter charged and convicted of manufacturing methamphetamine, possession of drug paraphernalia with the intent to manufacture, and possession of drug paraphernalia. This appeal followed.

Prior to trial, appellant filed a motion to suppress. In denying appellant's motion to suppress, the court acknowledged its hesitation in denying the motion because it was based solely on the fact that appellant had purchased matches, stating:

> This is a very close case. There's very little information and I'm just kind of skimming over the case law here. Some of the case law indicates that the police officer may rely on his experience and make inferences and deductions that might well elude the untrained person and the significance of matches, of course, is that the striker plates from matches are used as a source of phosphorus in the illegal production of methamphetamine.

> The fact that a person is observed with behavior consistent with innocence will not preclude a legitimate stop. The information which was received was scant. I would admit that. It was that a person had purchased matches. I don't see anyway that would give rise to a reasonable suspicion that a person was involved in criminal activity. I read that part of the Rule to make certain of what I'm saying.

> Under 3.1, "a law enforcement officer lawfully present in any place may, in the performance of his duty, stop and detain any person who [he] reasonably suspects is committing, has committed, or is about to commit a felony."

> In this case my ruling turns on one word. They received information that a person had bought a large number of matches. I think that rises above pure conjecture. It gives the officers reason to stop and inquire.

> I'm troubled somewhat. I'll clearly say that on the record. But I think the fact that they received information that the person had received a large number of matches, which, in the officer's experience, the strike plates can be used a source of phosphorous to make

illegal methamphetamine, I think that gave rise for reasonable suspicion. If the call had been that he received matches, I would have ruled differently.

■ In reviewing the denial of a motion to suppress, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court and proper deference to the trial court's findings. *See Jackson v. State,* 359 Ark. 297, 197 S.W.3d 468 (2004). The trial court's ruling will not be reversed unless it is clearly against the preponderance of the evidence. *Bogard v. State,* 88 Ark. App. 214, 197 S.W.3d 1 (2004). We will defer to the trial court in assessing the credibility of witnesses. *Id.*

Appellant argues first that the police lacked reasonable suspicion to stop him based simply on an informant's information that he had just bought some matches; therefore, the initial stop and the subsequent search of his home were illegal seizures and thus inadmissible. We agree.

■ The analysis begins with whether the officer had reasonable suspicion to stop appellant's car based upon the tip that Pace provided to the police department. Under Ark. R. Crim. P. 3.1, a detention without arrest may transpire under certain circumstances:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony[.]

*Sims v. State,* 356 Ark. 507, 157 S.W.3d 530 (2004). Our criminal rules further define "reasonable suspicion" as "a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." *Id.* (citing Ark. R. Crim. P. 2.1). The existence of a reasonable suspicion must be determined by an objective standard, and due weight must be given to the "specific reasonable inferences" an officer is entitled to derive from the situation in light of his experience as a police officer.

*McConnell v. State*, 85 Ark. App. 77, 146 S.W.3d 370 (2004). In *Laime v. State*, 347 Ark. 142, 155, 60 S.W.3d 464, 473 (2001), the supreme court held that "whether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity." Moreover, the General Assembly has passed legislation listing the factors to be considered in determining if a police officer has grounds to reasonably suspect:

(1) The demeanor of the suspect;

(2) The gait and manner of the suspect;

(3) Any knowledge the officer may have of the suspect's background or character;

(4) Whether the suspect is carrying anything, and what he is carrying;

(5) The manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors;

(6) The time of the day or night the suspect is observed;

(7) Any overheard conversation of the suspect;

(8) The particular streets and areas involved;

(9) Any information received from third persons, whether they are known or unknown;

(10) Whether the suspect is consorting with others whose conduct is "reasonably suspect";

(11) The suspect's proximity to known criminal conduct;

(12) Incidence of crime in the immediate neighborhood;

(13) The suspect's apparent effort to conceal an article;

(14) Apparent effort of the suspect to avoid identification or confrontation by the police.

Ark. Code Ann. § 16-81-203 (1987). The supreme court has stated that § 16-81-203 is merely illustrative, and not exhaustive, of the types of factors that may be considered in forming reasonable suspicion. *Laime v. State, supra* (citing *Potter v. State*, 342 Ark. 621, 30 S.W.3d 701 (2000); *Muhammad v. State*, 337 Ark. 291, 988 S.W.2d 17 (1999)).

Although neither appellant nor the State addressed this case in terms of establishing reasonable suspicion of the police based on a tip from a citizen-informant, we believe we must address it that way because the information was gathered from a report of a citizen. Moreover, although most citizen-informant cases we found dealt with citizen-informants who reported drunk drivers, we believe that they are likewise applicable in this instance. When reasonable suspicion is based solely on a citizen-informant's report, the three factors in determining reliability are (1) whether the informant was exposed to possible criminal or civil prosecution if the report is false, (2) whether the report is based on personal observations of the informant, and (3) whether the officer's personal observations corroborated the informant's observations. *See Frazer v. State*, 80 Ark. App. 231, 94 S.W.3d 357 (2002).

In *United States v. Araque*, 255 F. Supp. 2d 1010 (Neb. 2003), employees from the Mercantile Store in Sidney, Nebraska, who were trained by law enforcement to recognize materials used to produce methamphetamine in clandestine labs, reported the attempted purchase of two gallons of iodine to the Cheyenne County Sheriff's Office. They described the car and provided the license-plate number. A Cheyenne County deputy searched for the car, locating it in Sidney, Nebraska. The sheriff deputy contacted the Sidney police, who joined in conducting surveillance of the car and its occupants. The officers observed appellant's co-defendant going into and leaving two drug stores with purchases. Sidney Police contacted one of the stores to inquire as to what was purchased and learned that fifteen boxes of cold medicine containing pseudoephedrine were purchased. The officers stopped the vehicle. After obtaining consent to search, the officers found the cold medicine, along with other items and chemicals used to manufacture methamphetamine. Appellant's co-defendant also informed the police that she lived with the defendant and that

they had a methamphetamine lab in their apartment. A search warrant was then obtained for the apartment and a lab was discovered.

On appeal, Araque sought to suppress evidence, arguing in part that:

> no testimony established the store employees as reliable informants, that none of the officers observed the defendant commit any traffic violations, and that the stop occurred mid-day in a commercial section of Sidney. Based on these facts, the defendant argues that the officers could not reasonably believe that the occupants of the car were engaged in criminal activity; the stop therefore was based only [on] "an inarticulable hunch or generalized suspicion."

*United States v. Araque*, 255 F. Supp. 2d at 1012.

In its analysis, the court provided:

> Here, Cheyenne County law enforcement officials have trained area merchants, including employees of the Mercantile Store, to be on the lookout for individuals buying equipment and precursor chemicals for methamphetamine production. Mercantile Store employees informed the sheriff's office that two men had tried to buy *an unusually large quantity of iodine* but had left the store without the iodine when asked to produce identification. The suspicious employees gave the sheriff's office the description and license plate number of the men's car. *While the tip from the Mercantile Store employees might not alone have been sufficiently reliable to justify an investigatory stop of the car, their information did not stand in isolation.* Before approaching the car, Chief Deputy Sheriff Jenson and other officers initiated surveillance and personally observed a female occupant of the vehicle go into two drug stores and return to the car with purchases. In addition, Officer Slama verified with an employee of one of those stores that the woman had purchased multiple boxes of cold medicine containing pseudoephedrine — a precursor drug for methamphetamine.
>
> The defendant is correct that purchasing quantities of iodine or cold medicine with pseudoephedrine is not illegal. But "innocent behavior frequently will provide the basis for a showing of probable cause" or for a less demanding showing of reasonable suspicion. *Illinois v. Gates*, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In determining whether reasonable suspicion exists, "the

relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* When individuals purchase (or attempt to purchase) unusual quantities of both iodine and cold medicine·with pseudoephedrine within a very short time, an officer with Jenson's experience and training could reasonably suspect that the individuals were collecting materials needed to make methamphetamine. I find that when the officers decided to stop the car, they had enough facts, given the totality of the circumstances, to form a reasonable suspicion that the occupants in the car were engaged or about to be engaged in criminal activity. The defendant's motion to suppress must therefore be denied.

*United States v. Araque,* 255 F. Supp. 2d at 1012 (emphasis added). Although not binding on this court, we find *United States v. Araque, supra,* highly persuasive.

Taking into consideration the factors of § 16-81-203 in the instant case, the only factor present was information received from Darrell Pace that appellant had bought a "large quantity" of matches from his store. No question was asked to ascertain what constituted a "large quantity." That alone, absent any other factors articulated in § 16-81-203 or any other evidence in the record lending support to a finding of reasonable suspicion, such as relevant personal observations of the officers, did not give rise to reasonable suspicion beyond speculation and conjecture. Darrell Pace, the informant, was a person known by law enforcement officers, who had participated in training to recognize crime precursors, and provided accurate and reliable information to them in the past. Accordingly, the police knew the informant's name and address, exposing him to potential prosecution for making a false report. *See Frette v. City of Springdale,* 331 Ark. 103, 959 S.W.2d 734 (1998). Courts quite frequently find that information is presumed reliable when it comes from an identified person. *See id.* Nevertheless, Jason Pace testified that "a local business had called and stated that a gentlemen [sic] had come and purchased a large amount of matches." After receiving consent to search the vehicle, Pace found the matches during his interior search. He did not know how many packages of matches there were in the vehicle.

On cross-examination, Pace testified that "[t]he only thing that I knew about originally was that someone had bought some matches from my father's store. . . . I became suspicious that

whoever bought these matches might be manufacturing methamphetamine. Those large amount of matches purchased." We point out that appellant's seizure was based simply on the fact that he bought a "large quantity" of matches. Officer Pace, at the time of the stop, knew nothing about appellant's subsequent purchase of Sudafed. Nor was Officer Pace aware that appellant was driving on a suspended license. A reasonable officer, under these circumstances, should want to know what constituted a "large quantity" of matches. Without further exploration and in light of the fact that Darrell Pace sold the matches to appellant and that the police had access to Darrell Pace to make an inquiry into exactly how many matches Darrell Pace considered to be a "large quantity," we hold that, under the totality of these circumstances, the officers lacked reasonable suspicion that gave rise to probable cause requisite to justify a lawful stop. Accordingly, giving due weight to inferences drawn by the trial court and proper deference to the trial court's findings, we hold that the trial court's ruling was clearly against the preponderance of the evidence; therefore, we reverse and remand.

Following our determination that the police lacked reasonable suspicion to stop appellant, we must consider whether the evidence seized from appellant's home was "fruit of the poisonous tree." We conclude that the evidence should have been suppressed.

In *Keenom v. State*, 349 Ark. 381, 390-91, 80 S.W.3d 743, 748-49 (2002), our supreme court cited directly from *Wong Sun v. United States*, 371 U.S. 471 (1963), stating its holding that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
>
> * * *
>
> This holding represents the general policy that "knowledge gained by the Government's own wrong cannot be used by it in the way proposed." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The policies of this rule do not

make any logical distinction between physical and verbal evidence. *Wong Sun, supra.* The Supreme Court in *Wong Sun* stated that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.*

The consensual search of appellant's home in this case was based upon the statements made by appellant to the officers following his illegal seizure. There was no break in time between the events leading up to appellant's arrest and the inculpatory statements he made that led to the search. In other words, the primary taint of the unlawful seizure had not been sufficiently attenuated or purged. Under these circumstances, the fruits of the consensual search were poisoned by the officers' unlawful conduct in seizing appellant. Accordingly, we conclude that appellant was deprived of his Fourth Amendment rights and that the evidence should have been suppressed.

Appellant also contends that the trial court erred in denying his motion for a new trial. Following appellant's conviction, he filed a motion for a new trial on October 10, 2003, on the basis that the State failed to inform him of certain evidence gathered that was exculpatory as to his involvement in the crimes. Because we hold that appellant's stop lacked reasonable suspicion and that the evidence should have been suppressed as "fruit of the poisonous tree," we need not address this issue.

Reversed and remanded.

HART and GLOVER, JJ., agree.