George Larue HALL *v.* STATE of Arkansas

CR 04–1007 206 S.W.3d 830

Supreme Court of Arkansas
Opinion delivered April 14, 2005

[Rehearing denied May 19, 2005.]

*Cullen & Co., P.L.L.C.,* by: *Tim Cullen,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Kent G. Holt,* Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant George Larue Hall was convicted of two counts of capital murder and was sentenced to two consecutive life sentences.

On May 3, 2002, the bodies of Brad Dison and Craig Tedder were found next to a pickup truck in an alley in Little Rock. Both men had been shot multiple times with more than one weapon, and had died from their wounds. Police found that Tedder was carrying over $500 in cash and a small bag of marijuana on his person, and Dison possessed just over $57. In addition, police found a sack containing $25,000 in cash and at least two guns. The keys to the truck were found next to the vehicle. There were no eyewitnesses to the shooting, and although the police did not immediately arrest anyone, Hall was a suspect early in the investigation.

In April of 2003, police obtained information from Katrina Norris, who told police that she believed Hall had been involved in the killings. Officers placed a recording device on Norris, who then spent the better part of April 30 and May 1, 2003, with Hall. On the second day, Hall confessed to Norris that he had killed Dison and Tedder. Police arrested Hall on May 6, 2003, and charged him with two counts of capital murder. Initially, Hall was charged with premeditated and deliberated capital murder or, in the alternative, with capital murder committed in the course of or in furtherance of an aggravated robbery, but the State later dropped the premeditated and deliberated charge and opted to pursue the felony murder charge.

Prior to trial, Hall moved to suppress the confession Hall had given to Norris,[1] but the trial court denied the motion. The case proceeded to trial, and a jury found Hall guilty of two counts of capital-felony murder. On appeal, Hall challenges the sufficiency of the evidence and the trial court's denial of his motion to suppress.

Hall first argues that the trial court erred in denying his motion for directed verdict on the capital murder charges, and contends that the State's evidence was insufficient to prove that Hall committed an aggravated robbery as the felony underlying the capital murder charge. He asserts that the only evidence that he committed an aggravated robbery came from his confession, and that confession was not corroborated.

 A motion for a directed verdict challenges the sufficiency of the evidence. *Jenkins v. State*, 350 Ark. 219, 85 S.W.3d 878 (2002); *Pickens v. State*, 347 Ark. 904, 69 S.W.3d 10 (2002). The test for determining sufficiency of the evidence is whether substantial evidence, direct or circumstantial, supports the verdict. *Jenkins, supra.* Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.* On appeal, we review the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.*

 As noted above, Hall was eventually charged and convicted of capital murder under Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997), which, in relevant part, provides that a person commits capital murder if, "[a]cting alone or with one (1) or more other persons, he commits or attempts to commit . . . robbery . . . , and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life." Under this subsection of the capital murder statute, the State must first prove the underlying felony, *see Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002), which in this case is aggravated robbery. A person commits the offense of aggravated robbery "if he commits robbery as defined in

---

[1] Hall's attorney actually captioned his pleading a "motion in limine," as they were past the omnibus hearing, but both defense counsel and the prosecutor agreed that it was a motion to suppress, and the trial court treated it as such.

§ 5-12-102, and he (1) [i]s armed with a deadly weapon or represents by word or conduct that he is so armed; or (2) [i]nflicts or attempts to inflict death or serious physical injury upon another person." Ark. Code Ann. § 5-12-103 (Repl. 1997). A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another. Ark. Code Ann. § 5-12-102 (Repl. 1997).

Hall does not challenge the sufficiency of the evidence supporting the act of murder itself; rather, his argument focuses solely on the State's proof offered in support of the underlying felony. He contends that the only evidence that an aggravated robbery or attempted aggravated robbery was committed ensued from his own out-of-court statements to Norris and other State witnesses that he had initially intended only to rob Dison and Tedder. Hall submits that such testimony by others, describing his own confession, cannot be used to corroborate the confession or sustain his capital-felony murder conviction. In support of his contention, Hall cites Ark. Code Ann. § 16-89-111(d) (1987), which provides as follows:

> A confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the offense was committed.

See also *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001); *Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996); *Bishop v. State*, 294 Ark. 303, 742 S.W.2d 911 (1988).

■■ Under the *corpus delicti* rule, the State must prove (1) the existence of an injury or harm constituting a crime, and (2) the injury or harm was caused by someone's criminal activity. *Barnes*, 346 Ark. at 98; *see also Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995). This court has noted that, in an aggravated robbery case, this rule requires the State to prove that the accused intended to commit felony or misdemeanor theft and employed or threatened to employ the use of deadly force during the commission of the crime. *See Jenkins v. State*, 348 Ark. 686, 75 S.W.3d 180 (2002). As noted above, Hall maintains that the State offered no evidence, other than his own statements, that a robbery was committed or attempted. The lack of such evidence, he contends, requires reversal of his conviction for capital-felony murder.

■ ■ In *Hart v. State*, 301 Ark. 200, 783 S.W.3d 40 (1990), this court was required to decide whether the State had presented sufficient proof to corroborate the statements that the appellant, Hart, had made to the police. There, Hart had been charged with and convicted of theft by receiving; on appeal, he argued that the evidence, although sufficient to support the crime of theft, was not enough to prove that he had committed the crime of theft by receiving. In considering the purpose of the *corpus delicti* rule, this court noted that the primary purpose of the rule is "to insure that a person is not convicted of a crime that did not occur." *Hart*, 301, Ark. at 203. As a general rule, the court stated, the connection of the accused with the crime is not an element of the *corpus delicti*. *Id*. The *Hart* court, citing other jurisdictions that had considered the issue, wrote further as follows:

> Some courts literally require every essential element of the crime to be proved by independent evidence. *See Forte v. United States*, 94 F.2d 236 (D.C. Cir. 1937). *See also* Annot., 45 A.L.R.2d 7(b) at 1329-31. Others do not; it is sufficient if the corroborating evidence tends to establish the major or essential harm.

> In *People v. Cantrell*, 8 Cal.3d 672, 105 Cal. Rptr. 792, 504 P.2d 1256 (1973), disapproved on other grounds, *People v. Wetmore*, 22 Cal.3d 318, 149 Cal. Rptr. 265, 583 P.2d 1308 (1978), and *Gentry v. State*, 416 So.2d 650 (Miss. 1982), it was held that *in felony-murder prosecutions, independent proof of the underlying felony, such as robbery, does not have to be produced to establish the corpus delicti of the offense.* [Emphasis added.] In *People v. Cantrell*, the court quoted with approval:

>> The *corpus delicti* of the crime of murder having been established by independent evidence, both reason and authority indicate that *the circumstances surrounding the commission of the crime can be shown by the extra-judicial statements of the accused, and that such evidence of the surrounding circumstances may be used to establish the degree of the crime committed.* [Emphasis added.]

> The California courts still follow this reasoning. *See [People v. Kelly*, 51 Cal.3d 931, 275 Cal. Rptr. 160, 800 P.2d 516 (1991);] *People v. Howard*, 44 Cal.3d 375, 243 Cal. Rptr. 842, 749 P.2d 279, *cert. denied*, 488 U.S. 871, 109 S. Ct. 188 (1988).

> In *Gentry v. Mississippi*, the court said the following:

>> It is well established in this state that the *corpus delicti* in a homicide case is made up of two fundamental facts, the first

being the death of the deceased and the second the fact of the existence of a criminal agency as to the cause of death. [Citation omitted.] Thus, in a prosecution for premeditated murder the state is not required to prove independently those mental elements if the defendant had made a confession that admitted them. *It follows that independent proof of the felony in a felony-murder prosecution is not necessary if the proof of the felony can be gathered from the confession.* In this case the state satisfied the burden upon it by proving the death and that it resulted from a criminal agency. Appellant confessed that he killed the deceased while committing armed robbery. [Emphasis added.]

*Hart,* 301 Ark. at 203-04.[2] Stated another way, so long as the *corpus delicti* of the homicide (i.e., death caused by a criminal agency) is established by independent evidence, the predicate felony may be shown by confession alone.

In this case, at least four witnesses testified that Hall had told them that he intended to rob the murder victims. For example, Jarvis McKeller testified that he and some friends were sitting in a car belonging to a friend, Vashay Franklin, smoking marijuana and talking when they heard gunshots; shortly thereafter, Hall approached the car with "speckles of blood on his shirt," and offered them $200 in exchange for a ride. After McKeller and his friends dropped Hall off at the house of E.J. Harris,[3] Hall made a comment to the effect that "he didn't get it," which McKeller understood to refer to money. Likewise, LaToya Thomas, who was one of McKeller's friends in Franklin's car that day, described how Hall approached them with blood on his shirt, asking if anyone had heard gunshots. Then, according to Thomas, Hall "[said that] him and his friends or whatever just killed some dudes for such and such amount of money. He didn't say really a certain price. He was just like, 'G's,' like thousands of dollars." Thomas also said that, after they took Hall to Harris's house, Hall made a comment to the effect that "they didn't get no money."

---

[2] Some states have rejected this rule, requiring the State to prove each element of both the homicide and the predicate felony. *See DeJesus v. State,* 655 A.2d 1180 (Del. 1995); *State v. Bradford,* 254 Kan. 133, 864 P.2d 680 (1993); *People v. Emerson,* 203 Mich. App. 345, 512 N.W.2d 3 (1994); *Gribble v. State,* 808 S.W.2d 65 (Tex. Crim. App. 1990).

[3] Harris was also charged in the murders.

The State's key witness was Katrina Norris. Norris testified that Hall contacted her in April of 2003 and said he wanted to talk; at that time, he mentioned his involvement in the May 2002 killings, telling Norris that "the purpose of the whole deal" was "for money." Norris contacted the police, who arranged for her to wear a wire and record Hall in the hopes that he would confess. Norris drove around with Hall for two days, wearing the recording device. On the second day, as they were sitting in a park in Conway, Hall told Norris that he and his cousin, Harris, had set up a fake drug deal with Tedder and Dison, but did not intend to sell drugs to the victims. Instead, Hall told Norris, they "really just planned to rob [them] for their money, but it got to the point where the cousin got nervous and shot one guy, and then [Hall] shot the other guy."

Chandra Baskin also testified that Hall told her he had killed Dison and Tedder, stating that on the day of the killings, Hall had picked her up, and they drove to Conway, where they spent the night in a motel. The next morning, Hall left the room and returned with a newspaper, telling Baskin to read an article about the murders on the front page. Later, Hall told Baskin that he and some friends had arranged to meet Dison and Tedder, and that once the shooting started, Hall "kept shooting until he knew that [they were] dead." Hall also told Baskin that "it was supposed to [have] been a drug deal, but they knew that it was a robbery."

As mentioned above, Hall does not contend that there was insufficient evidence of the act of murder. Further, the *corpus delicti* of the crime of murder having been established, the underlying felony of aggravated robbery was clearly shown by the extra-judicial statements of the accused. Therefore, we conclude that there is no merit to Hall's challenge to the sufficiency of the evidence.

In his second point on appeal, Hall argues that the trial court should have granted his motion to suppress his confession to Katrina Norris, because Norris failed to advise him of his *Miranda* warnings before questioning him about his involvement in the shootings. *Miranda* warnings are only required in the context of a custodial interrogation. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997); *Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996). The question here is whether Hall was "in custody" at the time he made his incriminating statement to Norris.

The facts leading up to Hall's statement were as follows: On April 21, 2003, Hall contacted Norris on the phone, saying that he "wanted to talk," although he didn't specify what he wanted to talk about. When he later spoke to Norris, Hall said that he had gone to New York for a while, because he had been "involved in [an] incident." Hall explained that the "incident" was the May 2002 murders, describing how he and his cousin had set up a fake drug transaction in order to rob Dison and Tedder. Hall also told Norris that, although the Little Rock police had spoken to him, they had no evidence to connect him to the murders.

After Hall left Norris that night, Norris called the police. After a few days, Norris met with Detective Ronnie Smith and gave him a taped statement that included all the information she had gotten from Hall. Smith asked Norris if she would be willing to wear a wire, and Norris agreed. On April 30, 2003, Norris met with police officers, who rented her a car and put a recording device in a cigarette pack in her purse. Norris picked Hall up and drove him to Fordyce. During this time, about ten plain-clothes police officers followed Norris's car in unmarked vehicles. Hall made no mention of the murders that day. The next morning, Norris picked Hall up again; this time, Norris had hidden the recording device in her hair because Hall had rummaged through her purse and picked up the cigarette pack the day before. Again, Norris and Hall drove around, eventually driving to Conway. The two went to a park, and during the conversation there, Hall "went on to explain the murder situation again." After dropping Hall off that afternoon, Norris met with Detective Smith, who retrieved the wire from her.[4] Hall was arrested on May 6, 2003.

 On appeal, Hall argues that his conversation with Norris amounted to a custodial interrogation, such that he should have been given his *Miranda* warnings. He contends that 1) Norris was acting as an agent of the State; 2) Norris's questioning of him constituted an "interrogation"; 3) the questioning was intended to elicit incriminating information; and 4) the interrogation was "custodial" in nature. As previously noted, the *Miranda* warnings are only required in a custodial interrogation situation. This court

---

[4] Norris received $2500 for providing this information to the police; $1000 came from the city's "Crimestoppers" fund; $1500 came from the police department's "special Investigations Informant Pay Fund."

and the Supreme Court have held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Pittman*, 360 Ark. 273, 200 S.W.3d 893 (2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291 (1980)).

 This court has held that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. *State v. Spencer*, 319 Ark. 434, 892 S.W.2d 484 (1995) (citing *Berkemer v. McCarty*, 468 U.S. 420 (1984)). The *Miranda* warnings are not required simply because the questioned person is one whom the police suspect. *Id.* (citing *California v. Beheler*, 463 U.S. 1121 (1983) (*per curiam*)); *Smith v. State*, 343 Ark. 552, 39 S.W.3d 739 (2001). A person is "in custody" for purposes of the *Miranda* warnings when he or she is "deprived of his freedom by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Wofford*, 330 Ark. at 28. In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. *Id.* The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated. *Id.* at 28-29.

 In this case, when Hall made his incriminating statement to Norris, they were sitting on a park bench in Conway. There was no testimony that any police officers were visible anywhere in the vicinity. A reasonable man, sitting on a park bench with a friend, would not have felt that he was "restrained" at the time Hall made his statement. Clearly, Hall's freedom of action was not curtailed to a degree associated with formal arrest. The fact that Norris was acting as an agent of the police did not render the setting "custodial" in any sense. *See Patterson v. Illinois*, 487 U.S. 285, 297 fn.9 (1988) (noting that a "surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any *Miranda* violation as long as the 'interrogation' was not in a custodial setting"). Therefore, the trial court did not err in denying Hall's motion to suppress.

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for adverse rulings objected to by Hall but not argued on appeal, and no prejudicial error is found.

Affirmed.