2012 Ark. App. 131

**Danny Lee ASHLEY, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–613.**

Court of Appeals of Arkansas.

Feb. 8, 2012.

Chistopher A. Cordero, Benton, for appellant.

Dustin McDaniel, Atty. Gen., Valerie Glover Fortner, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Danny Lee Ashley appeals his convictions for possession of methamphetamine and possession of drug paraphernalia with intent to manufacture methamphetamine. On appeal, Ashley argues that the trial court erred in denying his motion to suppress verbal statements and physical evidence and erred in denying his motions for directed verdict. We find no error and affirm.

Ashley was charged with possession of drug paraphernalia with intent to manufacture methamphetamine and possession of a controlled substance (methamphetamine) with intent to deliver. Prior to trial, he filed a motion to suppress arguing that statements he made and evidence seized from his possession should be suppressed.

The suppression hearing was held on October 25, 2010. Brent Cole, assistant police chief for the Sheridan Police Department, testified that he received a call on February 2, 2010, from Carroll at the feed store stating that a white male had just purchased five one-pound bags of organic iodine. Cole, who had been in law enforcement for sixteen years and was a certified methamphetamine-lab technician, testified that iodine could be used to manufacture methamphetamine and was also used to treat hoof rot in cows. The policy of the feed store was to have purchasers of iodine show identification and sign a log-book. Carroll gave Cole the license-plate number of the purchaser's vehicle. Cole and Agent Eddie Keathley, supervisor of Group 6 Narcotics, responded in an unmarked truck and located Ashley's vehicle as it was driving by. Cole and Keathley followed the vehicle through town for approximately a mile until the vehicle pulled into a bank. Brian Clark, the passenger in Ashley's vehicle, repeatedly looked back at the officers and was acting very suspicious. Cole and Keathley parked approximately thirty feet from the bank's entrance as Clark exited the vehicle and went inside the bank for a short time. Clark was watching the officers as he went in and out of the bank.

As Clark was exiting the bank, Cole and Keathley drove up and parked their truck near the rear of Ashley's car, but not blocking it. Cole walked to the passenger side of the vehicle as Clark was reentering the vehicle. Cole explained who he was and asked Clark to exit the vehicle. Cole asked Clark if he had any cows, and Clark responded that Cole needed to speak to Ashley. Cole went to the driver's side of the vehicle where Ashley was sitting and asked him to step out of the car. Cole testified that Ashley was not under arrest or in custody at this point. Cole asked Ashley how many cows he had in his apartment, and Ashley stated that he was buying the iodine for someone else. Cole then asked Ashley what he thought this other person was using the iodine for, and Ashley said it was to "cook dope." Cole testified that at this point he considered Ashley to be under arrest. Cole then asked Ashley if he had anything illegal on him. Ashley did not verbally respond, but he looked down at his shirt pocket, took a deep breath, and did not look back up at Cole. Cole checked the shirt pocket and

found two small containers that contained five baggies of methamphetamine. Cole then placed Ashley under arrest. The transaction lasted approximately twelve to fifteen minutes. Ashley's vehicle was subsequently searched, and five one-pound bags of iodine were found.

At the police department, Keathley advised Ashley of his *Miranda* rights using a rights form, which Ashley signed. Keathley testified that Ashley stated the iodine was being used to "cook dope" and that he was going to trade the iodine for meth. Ashley would not say who he was going to trade with.

Cole testified that Carroll from the feed store had previously called him about purchases such as this one. Cole stated that for the amount of iodine that was bought, the purchaser would have to have a big ranch. Cole admitted that he did not have any knowledge that Ashley had made purchases of other materials that could possibly be used for manufacturing methamphetamine. Cole testified that the men were free to leave when he approached them to talk. He stated that even though he knew Ashley did not have cows, if Ashley had told him the iodine was for cows, he could not have arrested him. Cole and Keathley were both in plain clothes at the time they talked to the men. Cole had his badge on his belt and was wearing a weapon. Keathley was wearing his badge on a chain around his neck and was wearing a weapon. Cole acknowledged having his hand on his gun for safety purposes.

The trial court denied the motion to suppress, and a jury trial was held on December 13, 2010. Officers Cole and Keathley testified the same as they had at the suppression hearing. They both also testified that the packaging of the drugs in five individual baggies was indicative of selling drugs. However, Keathley also testified that it could be indicative of drugs that were just bought. Keathley testified that Ashley told him he had bought more methamphetamine than usual because he had extra money. Lauren O'Pry, a forensic chemist at the State Crime Lab, testified that the substance in the baggies seized from Ashley was amphetamine. She said that it was different from methamphetamine but that it was still a Schedule II stimulant drug.

When the State rested, Ashley moved for a directed verdict. On the charge of possession of drug paraphernalia with intent to manufacture methamphetamine, he argued that there was no evidence of his intent to manufacture methamphetamine because he possessed only one component, iodine, necessary for manufacture. The court denied this motion. On the charge of possession of methamphetamine with intent to deliver, Ashley argued that the evidence established his intent to use the drugs, not deliver them. The court denied this motion as well.

Ashley testified that he and Clark went to the store and he had Clark go in and buy the iodine because he had trouble walking. Ashley said that an acquaintance asked him if he could buy the iodine because the acquaintance could not get it around where he lived. Ashley testified that he did not know that the salt form of iodine was used to make meth, although he did know liquid iodine was. He said that he did not know the iodine he bought would be used to make meth and he had not planned to trade it for meth. He denied telling the police these things. He claimed that Cole repeatedly asked him, and he finally responded that it might be used to "cook dope" but that he did not know. Ashley said he did not know if his acquaintance owned cows. He testified that he bought the methamphetamine found in his pocket the day before his arrest, and it was still packaged the way

he bought it. He claimed that he bought the drugs to use them and that he did not sell or manufacture methamphetamine.

Ashley renewed his motions for directed verdict on the same grounds argued before. The motions were denied. The State then made a motion to amend the criminal information to charge Ashley with possession with intent to deliver amphetamine and possession of amphetamine, as opposed to methamphetamine. Ashley objected to an amendment because both sides had rested so there would be no chance for him to cross-examine the chemist regarding this new charge. The State's motion was denied. Ashley then again moved for a directed verdict with respect to the charge of possession of methamphetamine with intent to deliver. This motion was denied.

The jury returned a verdict of not guilty on the charge of possession of methamphetamine with intent to deliver but guilty of the lesser-included offense of possession of methamphetamine. The jury also found Ashley guilty of possession of drug paraphernalia with intent to manufacture methamphetamine. He was sentenced as a habitual offender and received ten-year sentences on both convictions to run consecutively. Ashley then moved to set aside the verdict for possession of methamphetamine because there was no proof that he possessed methamphetamine. The court denied the motion. Ashley filed a timely notice of appeal.

■ Because of double jeopardy concerns, we must first review Ashley's challenges to the sufficiency of the evidence. See Percefull v. State, 2011 Ark. App. 378, 383 S.W.3d 905. Ashley first argues that the trial court erred in denying his motion for directed verdict on the charge of possession of drug paraphernalia with intent to manufacture methamphetamine because he lacked the intent to manufacture. A

motion for directed verdict is a challenge to the sufficiency of the evidence. Lueken v. State, 88 Ark.App. 323, 198 S.W.3d 547 (2004). When reviewing the sufficiency of the evidence, this court views the evidence in the light most favorable to the guilty verdict, considers only that evidence supporting the verdict, and affirms if substantial evidence supports the verdict. Id. Evidence is substantial when it is forceful enough to compel a conclusion and goes beyond mere speculation or conjecture. Id. Circumstantial evidence can be sufficient to sustain a conviction when it excludes every other reasonable hypothesis consistent with innocence. Id. The question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. Id.

Under Arkansas Code Annotated section 5–64–403(c)(5)(A) (Repl.2005), "[i]t is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to manufacture methamphetamine in violation of this chapter." Drug paraphernalia is defined as "any equipment, product, and material of any kind that are used, intended for use, or designed for use in ... manufacturing ... a controlled substance in violation of this chapter." Ark. Code Ann. § 5–64–101(14)(A) (Repl.2005).

Ashley argues that his testimony demonstrates that his conviction is based only on speculation and conjecture. He argues that he bought the iodine for a friend and that he did not have any intention of personally manufacturing methamphetamine and did not even know how to make it. He notes that when officers searched his car they found no other items used to make methamphetamine. He argues that he only speculated that the iodine might be used to "cook dope" after Cole's repeated demands. Ashley also claims that he did not tell Agent Keathley that he was going to trade the iodine for meth, and Keathley

admitted that this was not written in his report. The State argues that it does not matter that Ashley possessed only one ingredient, and one that also has a legal purpose, because the statute plainly states that it is illegal to possess any product intended for the manufacture of methamphetamine. The State argues that Ashley admitted to both officers that he knew iodine was used in manufacturing meth.

The credibility of witnesses is an issue for the jury. *Meadows v. State*, 360 Ark. 5, 199 S.W.3d 634 (2004). Furthermore, the jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Id.* Here, the jury chose to believe that Ashley knew the iodine was going to be used to make methamphetamine. There is substantial evidence to support the verdict, and we affirm on this point.

◼ ⌊8Ashley next argues that there was insufficient evidence to support his conviction for possession of methamphetamine because the State proved only possession of amphetamine. He contends that the material variance of the criminal information that charged him with possession of methamphetamine and the State's evidence of possession of amphetamine was unduly prejudicial to his defense. He argues that the State should have amended the information prior to trial to reflect that the drug at issue was amphetamine. Ashley claims he was prejudiced because the defense did not learn of the discrepancy until trial, and had they known before they would have changed his defense strategy. He further argues that methamphetamine is always an illegal drug, whereas amphetamines are commonly prescribed legal drugs.

The State argues that Ashley's argument is not preserved for appellate review because he did not raise it to the trial court. When the State rested, Ashley moved for a directed verdict on the charge of possession of methamphetamine with intent to deliver and argued that there was insufficient evidence of intent to deliver. He did not argue that the substance he possessed was not methamphetamine. Ashley's failure to move for a directed verdict on this ground at the close of the State's case precludes us from reviewing it. *See* Ark. R.Crim. P. 33.1. Furthermore, even though the chemist testified that the substance was amphetamine, Ashley testified that it was methamphetamine. The jury was free to believe Ashley and convict him based on this testimony.

◼ Last, Ashley argues that the trial court erred in denying his motion to suppress verbal statements and physical evidence because police lacked reasonable suspicion that he was ⌊9committing, had committed, or was about to commit a felony. In reviewing the denial of a motion to suppress, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court and proper deference to the trial court's findings. *Summers v. State*, 90 Ark.App. 25, 203 S.W.3d 638 (2005). The trial court's ruling will not be reversed unless it is clearly against the preponderance of the evidence. *Id.* We will defer to the trial court in assessing the credibility of witnesses. *Id.*

◼ Ashley argues that the police lacked reasonable suspicion to stop him under Arkansas Rule of Criminal Procedure 3.1; thus, he claims that the seized evidence and his statements were fruit of the poisonous tree that should have been suppressed. Rule 3.1 provides as follows:

A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony ... if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

The State argues that Ashley's motion to suppress was rightfully denied because he was never stopped or seized by police. Instead, the State claims that Ashley was approached by police as authorized under Arkansas Rule of Criminal Procedure 2.2. Rule 2.2 provides that an officer may approach a citizen and request that they furnish information or otherwise cooperate in the investigation or prevention of crime. This encounter is consensual and does not constitute a seizure. *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002). A seizure of a person occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *Id.* The initially consensual encounter is transformed into a seizure when, considering all the circumstances, a reasonable person would believe that he is not free to leave. *Id.*

The State argues that Ashley was not seized because he stopped his car voluntarily and Officer Cole was not threatening in his speech or actions. Ashley claims he was seized when he was approached by the officers because the officers positioned their vehicle behind his so that there was no way for him to leave, and the officers, wearing guns and badges, ordered him to step out of his car. Officer Cole acknowledged asking Ashley to exit his vehicle; however, both officers denied that Ashley's vehicle was blocked in. We hold that at this point, Ashley was detained under Rule 3.1.

Because Ashley was detained, Officer Cole must have had reasonable suspicion that Ashley was committing, had committed, or was about to commit a felony. Reasonable suspicion is defined as "a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R.Crim. P. 2.1. The existence of a reasonable suspicion must be determined by an objective standard, and due weight must be given to the specific reasonable inferences an officer is entitled to derive from the situation in light of his experience as a police officer. *McConnell v. State*, 85 Ark.App. 77, 146 S.W.3d 370 (2004). When reasonable suspicion is based solely on a citizen-informant's report, there are three factors for determining reliability: (1) whether the informant is exposed to possible criminal or civil prosecution if the report is false; (2) whether the report is based on personal observations of the informant; and (3) whether the officer's personal observations corroborate the informant's observations. *Id.*

Ashley challenges only the third prong, arguing that there was a lack of personal observations by the police, and he claims that this case is very similar to *Summers v. State*, 90 Ark.App. 25, 203 S.W.3d 638 (2005). In the instant case, the

informant told the police that a white male had bought five one-pound bags of iodine from the feed store just down the road from the police department, and he gave the police the vehicle's license-plate number. Officer Cole ran the license-plate number and determined that the registered owner was Danny Ashley. When the officers left the police department, the car with that license-plate number passed by them and its occupants were two white males. This is sufficient corroboration of the informant's observations. *See McConnell v. State*, 85 Ark.App. 77, 146 S.W.3d 370 (2004). While following the car, the police observed the passenger looking back at the officers and acting very suspicious. Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion, although nervousness alone does not constitute reasonable suspicion of criminal activity. *Lilley v. State*, 362 Ark. 436, 208 S.W.3d 785 (2005). Adding to Officer Cole's suspicion was his knowledge that Ashley lived in an apartment and did not own cows; thus, it was unlikely that Ashley had a legitimate purpose for buying such a large amount of iodine. We must give due weight to the reasonable inferences Officer Cole was entitled to derive in light of his sixteen years in law enforcement and qualifications as a certified methamphetamine-lab technician. Under these facts, there was reasonable suspicion for Officer Cole to detain Ashley. This case is distinguishable from *Summers*, where the only basis for the stop was a tip that the driver had purchased a "large quantity" of matches, which are used in the production of methamphetamine. The police did not ask the informant what constituted a "large quantity" and made no other relevant observations.

Ashley also argues that, based on the lack of reasonable suspicion, he was actually under arrest upon being questioned by Officer Cole; thus, he should have been read his *Miranda* rights before being questioned. *Miranda* warnings are only required in a custodial interrogation situation. *Hall v. State*, 361 Ark. 379, 206 S.W.3d 830 (2005). The supreme court has held that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. *Id.* Officer Cole detained Ashley for a short period of time to determine the lawfulness of his conduct. He did not have reason to arrest Ashley until Ashley said the iodine would be used to "cook dope." Although Ashley was detained under Rule 3.1, his freedom of action was not curtailed to a degree associated with formal arrest, and a *Miranda* warning was not required. *See Lee v. State*, 102 Ark.App. 23, 279 S.W.3d 496 (2008); *Bohanan v. State*, 72 Ark.App. 422, 38 S.W.3d 902 (2001).

The denial of Ashley's motion to suppress was not clearly against the preponderance of the evidence. Accordingly, we affirm.

VAUGHT, C.J., and ABRAMSON, J., agree.