SLIP OPINION



# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR–16–200

RANDY HAROLD MORRIS, JR.

APPELLANT

V.

STATE OF ARKANSAS

APPELLEE

**Opinion Delivered:** November 16, 2016

APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT
[NO. CR–2014-1075-6]

HONORABLE MARK LINDSAY, JUDGE

REVERSED AND REMANDED

## BART F. VIRDEN, Judge

Randy Harold Morris, Jr., appeals his conviction by a jury on one count of rape by a Washington County jury. His sole point on appeal is that the circuit court erred in denying his motion to suppress his statement to police. Specifically, Morris contends that the circuit court erred in finding that he was not "in custody" when he was interrogated by the police immediately prior to his arrest and that Morris's statement was made pursuant to an interrogation without his having been informed of his *Miranda* rights. We agree, and we reverse and remand for a new trial.

### I. *Facts*

On August 24 and 26, 2015, there was a suppression hearing concerning certain statements made by Morris to police immediately prior to his arrest. At the hearing, Springdale police officer Christopher James Eagle testified that on April 30, 2014, he responded to a report of rape at the Sleep Inn in Springdale. Eagle testified that he and other officers met with C.K.

in a conference room at the motel, where she told them the details of her attack. Officer Eagle stated that C.K. told officers that she and some friends had formed a plan to rob Morris. Instead, she met Morris at his hotel room and bought methamphetamine from him, and then she asked if she could use his shower. Eagle testified that C.K. had told them that, while she was in the shower, Morris pulled her from the shower, put her on the bed, tied her wrists with a zip tie, and injected her in the crook of her arm with an unknown substance. C.K. told officers that Morris had raped her orally, anally, and vaginally. Eagle stated that C.K. had told officers that, after the rape had occurred and while Morris was cleaning, she left to go get change at a nearby store so that Morris could do laundry. C.K. warned the officers that Morris had a knife and that he had used it to cut the zip ties.

Officer Eagle testified that he and Officer Landrum were in the hallway outside Morris's hotel room when Morris exited the room carrying a plastic bag that had a zip tie protruding from the top. Morris was also carrying a basket of clothes. Officer Eagle testified that he had his gun drawn and was holding it in a low position and that when Officer Landrum patted Morris down, he put his gun away.

Officer Jerry Corken testified that after Morris had been patted down, Morris asked if he could go check on his laundry but that "we asked him to wait." Officer Corken stated that after speaking to Morris in the hallway for a while, "the conversation was moved into the room because the hallway was starting to get really crowded with people coming out of their rooms." Officer Corken testified that, for safety reasons, they moved police and Morris into the hotel room.

Officer Kyle Naish testified that he stood opposite the hotel-room door with his back to the bedroom area so he could watch Detective Matt Ray and Morris. He testified that Detective Nelson was also in the room and that Morris was sitting on the couch. Officer Naish testified that Detective Robert Nelson took pictures of the room, while Officer Eagle came in to the room to remove drug paraphernalia from the couch cushions and that other officers "made a circle around the room to see if there was anything around." Officer Naish testified that the officers searched the bedroom, the bathroom, the closet, the television stand, and the dresser. After the search, they escorted Morris to his truck, obtained Morris's consent to search the truck, and then arrested Morris.

Officer Ray testified that Morris had not been informed by any of the officers that he could refuse to allow them into his room and that Morris had not been provided any *Miranda* warnings before or during the questioning that took place in his room. Officer Ray testified that he had asked Morris's permission to wrap the zip tie on Morris's wrist and that Morris had agreed. Officer Ray testified that the interview with Morris in his room lasted somewhere between thirty and forty-five minutes. Officer Ray agreed that the questions he asked Morris were designed to elicit a confession or a self-incriminating statement and that the questions "were the type where his responses were either going to put him in prison or not."

The circuit court ruled that Morris had not been in custody that evening in his hotel room; therefore, Morris's statements would not be suppressed at the trial. The court reasoned that the facts recited at the hearing were analogous to those in *Collins v. State*, 2014 Ark. App. 574, 446 S.W.3d 199. It also stated that because Morris never objected, because he voluntarily

answered the police questions, and because he had prior felonies and was familiar with the police and police procedure, Morris "did not feel that he was under arrest."

A jury trial was held on September 28-29, 2015. At the trial Morris's recorded statement was played for the jury. In the statement, Morris admitted that he and C.K. had consensual sex. Morris explained to police that he had a legal prescription for methamphetamine but that C.K. did not receive any drugs from him, or do any drugs in front of him. In his recorded statement, Morris questioned why someone claiming to have been raped would have gone to the store and come back with change to do laundry. At that point, the following exchange occurred:

OFFICER RAY: I know why. Because you raped her. You tied her up and you raped her. That's the conclusion I just got.

MORRIS: Why did she leave and come back and leave and come back? In her own car? Maybe she's full of it! You are not going to call me a liar. If you want to take me to jail, take me to jail. Do not call me a liar.

OFFICER RAY: Then don't lie to me. Tell me the truth.

MORRIS: I told you. She's a freak. We had sex. We watched half a movie. No, I did not film it. I've been married eighteen years, and she comes up wanting to do this. This guy that introduced us can tell you that she wanted to have sex with me the night before, but I was too tired. No, she did not want to have sex for meth. I don't have any meth.

UNIDENTIFIED OFFICER: Yeah you do; it's right here.

OFFICER RAY: And you're sitting here saying I'm calling you a liar. I'm sure we're going to find meth in your truck, too.

MORRIS: If there is meth in the truck, somebody put it there. You just accused me of raping a woman. You know that's disrespectful. She raped me. I didn't want to have sex with her.

In his recorded statement, Morris also described having sex with C.K., and he explained that, afterward, C.K. took a shower and went to get breakfast for them.

4

OFFICER RAY: Here's the deal. You're being accused of rape. I've given you every opportunity to tell me exactly what happened. I'm not scared of you. Quit being intimidating.

MORRIS: I'm not. You ask the same things over and over again.

UNKNOWN OFFICER: When I first talked to you, what did I say? These are the allegations.

MORRIS: These aren't allegations when you are trying to beat something in me.

UNKNOWN OFFICER: Listen to what Detective Ray is saying. He's working for you. We have been doing this long enough to know something's wrong.

. . . .

OFFICER RAY: Did you rape her?

MORRIS: No, I did not.

Shortly thereafter Morris was placed under arrest on a charge of rape.

At the trial, C.K. testified that when she arrived at Morris's hotel room on April 29, 2014, she and Morris smoked methamphetamine, and then she took a shower. C.K. told police that while she was in the shower, Morris entered, threw her over his shoulder, and threw her on the bed. She testified that he held her down, restrained her wrists with zip ties, tied off her arm with a neutral-colored rubber band, and injected her with a substance she believed to be methamphetamine. C.K. testified that Morris had raped her orally, vaginally, and anally and that he had ejaculated in her mouth. C.K. stated that when he had finished raping her, he cut the zip tie with a black knife. C.K. said she got dressed and then Morris told her to go to his truck to get cleaning supplies. C.K. testified that, when she returned, Morris told her to go to the gas station across the street to get quarters. C.K. explained that she wrote a note and gave it to the gas-station attendant. In the note, C.K. stated that she had been raped, and she requested that

the attendant call the police. C.K. testified that she went back to the hotel room, that she told Morris that she was going to the lobby to get breakfast, and that the police arrived while she was out of the room.

Irene Whitaker, a nurse examiner specializing in sexual-assault cases, testified that she had examined C.K. on April 30, 2014. Whitaker testified that C.K. told her that she was on methamphetamine and that she had been orally, anally, and vaginally raped. Whitaker stated that C.K. explained that she had bitten her own lip and that she had pain in her wrists from being tied up. Whitaker testified that she made note of the red marks on C.K.'s wrists, the puncture where C.K. said she had been injected, and an unhealed, bleeding wound with bruising at the opening of C.K.'s cervix. Whitaker testified that the bruising was consistent with blunt-force trauma. Whitaker stated that though there was no injury to C.K.'s anus, this was consistent with C.K.'s statement. Whitaker testified that though C.K. had recounted being strangled with a belt, the fact that there was no bruising on her neck was still consistent with C.K.'s story.

In the State's closing argument, it stated, "Let's dispense with the first element, sexual intercourse. The victim told you they had sexual intercourse. You heard the defendant's recorded statement, and he agrees they had sexual intercourse. So we can scratch that off the list right now. The only thing we are here to determine is forcible compulsion." The State argued that the differences between the version of events presented in Morris's recorded statement and C.K.'s testimony about what had occurred that evening showed that Morris was lying.

The jury found Morris guilty of one count of rape. Morris was found to be a habitual offender pursuant to Arkansas Code Annotated section 5-4-501(b)(Supp. 2015), and he was



sentenced to twelve years in the Arkansas Department of Correction. Morris filed a timely notice

of appeal.

## II. *Standard of Review and Applicable Law*

This court reviews a circuit court's decision to deny a motion to suppress a statement by

making an independent determination based on the totality of the circumstances, and we will

reverse the ruling only if it is clearly against the preponderance of the evidence. *Matar v. State*,

2016 Ark. App. 243, at 5–6, 492 S.W.3d 106, 110.

The Fifth Amendment to the United States Constitution provides, in part, that "no

person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966) the United States Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

In *Hall v. State*, 361 Ark. 379, 389, 206 S.W.3d 830, 837 (2005) our supreme court set

forth the standard for determining when a suspect is in custody:

> This court has held that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. The *Miranda* warnings are not required simply because the questioned person is one whom the police suspect. A person is "in custody" for purposes of the *Miranda* warnings when he or she is "deprived of his freedom by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated.

 

(Citations omitted.)

## A. Custodial Interrogation

Morris argues that he was "in custody" when the police interviewed him in his hotel room. Based on our review of the totality of the objective circumstances present at the time of the police interview of Morris, we agree, and we hold that Morris was in police custody for purposes of *Miranda*.

The circuit court stated that the present case was similar to *Collins v. State*, 2014 Ark. App. 574, 446 S.W.3d 199, and found that Morris was not in custody at the time his statement was recorded. We disagree and hold that *Collins* is distinguishable from the instant case. In *Collins*, this court held that the circuit court did not clearly err by denying appellant's motion to suppress and based that decision in part on the fact that Collins never indicated that he wished to leave and partly on the extent of Collins's voluntary interaction with the police. In *Collins*, the appellant arrived home to find the police searching his house pursuant to a warrant. While they were searching his home, the police asked him to get into a patrol car and take them to a storage unit. Collins did so, and when they arrived at the storage unit, Collins agreed to let the police search the unit and signed a consent form. Collins did not try to leave or indicate that he wished to leave. By contrast, Morris asked if he could leave to go check on his laundry and Officer Corken testified that he said "'Could you hold on a little bit while we figure out what is going on?' I didn't tell him 'no,' but I didn't let him go get the laundry.'" Officer Corken's refusal to allow Morris to leave the presence of the police officers is an important difference between the present case and *Collins*.

The fact that Morris showed some compliance with the police was also cited by the circuit court in support of its ruling that Morris was not in police custody. Indeed, to a certain extent, Morris complied with the police officers' requests. Morris answered questions, went back into his hotel room with police officers, and allowed officers to search his truck after around thirty to forty-five minutes of being questioned inside his room with multiple officers present.[1] Morris exhibited more compliance when the issue was whether he was in possession of methamphetamine. He explained to officers that he had a prescription for the drug and even showed them the pharmacy-issued bottle. The consent for the police to search his truck was related to the methamphetamine issues; however, on the issue of whether he raped C.K. Morris did not demonstrate the same level of compliance. Morris argued with police, and he loudly, verbally confronted them about their accusation that he had raped C.K. In *Collins*, there is no mention of the appellant having argued with police or disputing their accusations against him as Morris did.

In addition to the facts that distinguish this case from *Collins*, the unique facts of this case indicate that a reasonable person would have felt that he or she was in custody. When Morris exited his hotel room, he encountered a police officer with his gun drawn. Morris was immediately searched by another police officer. The police officer escorted Morris back into his hotel room, and Officer Corken testified that he positioned himself in front of the door, effectively blocking the entrance. The small hotel room was filled with police officers and detectives extensively searching Morris's hotel room without a warrant, taking photographs, and

---

[1] Morris's redacted recorded statement included in the addendum measured a little over an hour in length.

bagging evidence, and at one point, even trying to fit zip ties around Morris's wrists in order to check his story against C.K.'s. "This court has consistently held that it is the objective circumstances that this court reviews on appeal rather than the subjective views harbored by the parties." *Collins*, 2014 Ark. App. 574, at 9, 446 S.W.3d at 206. We hold that, under these facts, a reasonable person would have felt that he or she was in custody for the purposes of *Miranda*.

We now turn to whether the custodial statement was made in the context of a police interrogation. Our supreme court has held that "interrogation" is direct or indirect questioning put to appellant by the police with the purpose of eliciting a statement from him or her. *Arnett v. State*, 353 Ark. 165, 172, 122 S.W.3d 484, 488 (2003). Clearly, Morris was the subject of a police interrogation, as the police officer who questioned Morris testified:

> DEFENSE COUNSEL: . . . [Y]ou ask him a lot of questions that have to do with him, either his response is either going to put him in prison or not, right?
>
> DETECTIVE RAY: Yes, sir.
>
> DEFENSE COUNSEL: That's the kind of questions you're asking. This is an interrogation.
>
> DETECTIVE RAY: Okay.
>
> DEFENSE COUNSEL: Is it? I don't know.
>
> DETECTIVE RAY: I mean, yes, there were probably some—there were questions there could elicit a confession. Yes, sir.

The police officers who questioned Morris that morning testified that they had asked questions with an aim toward eliciting incriminating information. They accused Morris of rape, and the interview ended with Morris's arrest on rape charges. We hold that the circuit court's ruling that Morris's statements were admissible because he was not in police custody was in error. Morris in custody for the purposes of *Miranda*, yet he was subjected to a custodial



interrogation by the police without having been informed of his right to remain silent, to seek counsel, or to stop the police questioning at any point even though he had already cooperated by answering their questions about the prior events that morning.

## B. Harmless Error

Some constitutional rights are so fundamental that their violation can never be deemed harmless error, others are subject to the harmless-error analysis. *Chapman v. California*, 386 U.S. 18 (1967); *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). The admission of statements obtained in violation of *Miranda* may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt. *United States v. Packer*, 730 F.2d 1151, 1157 (8th Cir. 1984). To conclude that a constitutional error is harmless and does not mandate a reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict. *Jones v. State*, 336 Ark. 191, 207, 984 S.W.2d 432, 440 (1999). The admission of evidence may be considered harmless when there is overwhelming evidence of guilt, and the error is slight. *Johnston v. State*, 2014 Ark. 110, at 7, 431 S.W.3d 895, 899, *reh'g denied* (Apr. 17, 2014). In determining whether the error is slight, we look to see if the defendant is prejudiced. *Id*.

We cannot say that the evidence of Morris's guilt was overwhelming. This case turns on C.K.'s and Morris's credibility, and both presented a different version of the events of the evening. In his statement, Morris admitted having sex with C.K., and the only thing left for the jury to determine was whether Morris had the used forcible compulsion to rape C.K.—a determination that relies entirely on the parties' credibility and the resolution of their conflicting versions of events. Morris states that he had sex with C.K., eliminating the State's burden of

proving that Morris committed the first element of rape.[2] As stated by the prosecutor: "You heard defendant's recorded statement, and he agrees they had sexual intercourse. So we can scratch that off the list right now. The only thing we are really here to determine is forcible compulsion." Because we cannot say the error in allowing Morris's statement is harmless, we reverse his conviction and remand for a new trial.

Reversed and remanded.

HARRISON and BROWN, JJ., agree.

*Keith, Miller, Butler, Schneider & Pawlik, PLLC*, by: *Mason L. Boling*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.

[2] Arkansas Code Annotated section 5-14-103(a)(1)(Repl. 2013) sets forth that a person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion.